[No. A114647. First Dist., Div. Five. Jan. 25, 2008.]

SECURITY NATIONAL GUARANTY, INC., Plaintiff and Appellant, v. CALIFORNIA COASTAL COMMISSION et al., Defendants and Respondents;
SIERRA CLUB, Intervener and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. and III.

404

406

COUNSEL

Thomas D. Roth; Collins Law Firm and Craig M. Collins for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, J. Matthew Rodriquez, Assistant Attorney General, Daniel L. Siegel and Peter Southworth, Deputy Attorneys General, for Defendant and Respondent.

California Environmental Law Project and Laurens H. Silver for Intervener and Respondent.

OPINION

NEEDHAM, J.—The principal question that we must resolve in this appeal is whether the California Coastal Act of 1976, Public Resources Code section 30000 et seq. (the Coastal Act),[1] empowers the California Coastal Commission (the Commission) to declare that property is an "environmentally sensitive habitat area" (ESHA) (§ 30240) during an administrative appeal from a local government's grant of a coastal development permit (CDP). Appellant Security National Guaranty, Inc. (SNG), challenges three orders of the superior court: the denial of SNG's petition for writ of administrative mandamus, the denial of SNG's motion to remand the matter to the Commission for further proceedings, and the grant of summary adjudication to the Commission.

We conclude that the Coastal Act grants the Commission no power to declare property an ESHA during a CDP appeal. Accordingly, we reverse the superior court's denial of SNG's petition for administrative mandamus. We affirm the superior court's grant of summary adjudication.

FACTUAL AND PROCEDURAL BACKGROUND

*The SNG Site*

Appellant SNG owns, and seeks to develop, a 39-acre oceanfront site located west of State Highway 1 on Monterey Bay in Sand City. From 1927 to about 1986, the Lonestar Company conducted one of the largest commercial sand mining operations in the western United States on the land now owned by SNG. Lonestar excavated and sold sand for industrial, commercial, and consumer uses. The sand mining operations left the site in an

---

[1] All further undesignated statutory references are to the Public Resources Code.

environmentally degraded condition, with an excavation pit near the middle of the property.

For many years after its incorporation in 1960, Sand City was the site of a number of businesses engaged in heavy commercial and industrial activities. Beginning in the 1970's, however, many of these businesses closed. Recognizing the city's need for economic recovery and development, Sand City sought to provide for commercially viable resort and recreational development on designated portions of its coastline.

### Sand City's Local Coastal Program

In the early 1980's, Sand City formulated its local coastal program (LCP).[2] The LUP adopted by Sand City designated what is now SNG's site for visitor-serving commercial uses. The original LUP also identified and mapped locations that were ESHA's. Section 4.2.4 of the LUP noted the existence of dune areas along the coast, explaining that the dunes were divided into two distinct locations—one east of Highway 1 and one west of Highway 1. As to the area west of the highway (and closest to the ocean), the LUP stated that "[t]he area provides no natural habitats . . ." and that no ESHA's existed west of Highway 1. The only ESHA's identified and mapped in the LUP were located *east* of Highway 1. No ESHA's were mapped on what is now SNG's site, which is located entirely west of the highway. The LUP designated the property at issue in this appeal for visitor-serving commercial uses, with a density not to exceed 650 units.

The Commission concluded that Sand City's LCP met the requirements of the Coastal Act and certified the LCP as consistent with the Coastal Act's goals and policies. During the certification process, the Commission proposed, and Sand City adopted, a number of modifications to the city's LCP. After these modifications, the Commission granted the Sand City LCP final certification on March 14, 1986.

In 1990, the Commission conducted a "periodic review" of Sand City's LCP pursuant to section 30519.5. The periodic review resulted in the Commission making 59 recommendations to Sand City, including both LCP

---

[2] Under the Coastal Act, local governments lying within the coastal zone must prepare an LCP, which is then submitted to the Commission for certification. (§ 30500, subd. (a).) An LCP is composed of two parts: a land use plan (LUP), which functions as the general plan for the property in the coastal zone; and the local implementation plan, which includes the zoning, zoning maps, and other implementing actions for the coastal zone. (§§ 30108.5, 30108.6.) The Commission must certify an LUP "if it finds that a land use plan meets the requirements of, and is in conformity with, the policies of Chapter 3 (commencing with Section 30200). . . ." (§ 30512, subd. (c).)

amendments and other actions. The record discloses no suggestion from the Commission that the property at issue in this appeal be designated an ESHA.

*The Memorandum of Understanding*

Beginning in the late 1980's, the Monterey Peninsula Regional Park District (the Park District) attempted to amend Sand City's LCP to make parks and open space the preferred use on all lands west of Highway 1. In addition, the Park District and the state Department of Parks and Recreation (the Parks Department) sought to acquire coastal land within Sand City for park purposes. Sand City vigorously resisted the Park District's efforts, because it wished to preserve certain coastal parcels for development to ensure a stable fiscal future for the city. Sand City eventually sued the Park District to challenge, among other things, the Park District's land acquisition program in the city.

The controversy between Sand City and the park agencies continued for years. In 1995, then state Senate Majority Leader Henry Mello intervened to mediate the coastal development dispute. Senator Mello arranged a meeting between the representatives of Sand City, the Park District, the Parks Department, and the Commission. As a result of this initial meeting, the interested parties formed a "discussion group" in an effort to resolve the conflict. After further meetings of this discussion group, the interested parties agreed to settle their differences by executing a "memorandum of understanding" (MOU).

On April 8, 1996, representatives of Sand City, the Sand City Redevelopment Agency, the Park District, and the Parks Department signed the MOU. The Commission was not a party to the agreement. Among other things, the MOU recognized the need for both "appropriate development" within Sand City and for the protection of coastal views, dunes, and public access to the beach. In particular, one of the MOU's stated objectives was to "[e]nable appropriate public and private development . . . to occur along the Sand City Coastline; including but not limited to visitor serving and residential uses." The MOU also recognized that the site formerly used by the Lonestar Company was subject to an option to purchase by a "private development company." That company was SNG.

With regard to the former Lonestar site, the MOU provided that during "the active period of the option . . . or in the event the option is exercised,

[the Parks Department], the [Park District], and [Sand City] agree to recognize and respect the option agreement and the option holder's right to pursue development of the Lonestar Site consistent with the Sand City LCP." During that same period, the Park District and the Parks Department agreed to cease their efforts to acquire the former Lonestar site. The Park District further agreed that it would revise its application to amend the Sand City LCP to exclude the Lonestar site from the amendment. Thus, the MOU contemplated that the bulk of Sand City's coastline west of Highway 1 would be set aside for park uses, but that in two specific areas, including the Lonestar site (now SNG's property), commercial and residential uses would be permitted.

Finally, the MOU provided that Sand City and the Sand City Redevelopment Agency would dismiss their action against the Park District. Assured by the MOU that some commercial and residential development would be permitted along the coast, Sand City and its redevelopment agency acquiesced to further acquisition of coastal properties by the park agencies for park and open space purposes.

### Amendments to the Sand City LCP

Prior to execution of the MOU, the Commission's staff had offered to assist Sand City and the park agencies "in developing the [LCP] amendments which are necessary to carry out the proposed MOU." To implement the MOU, the Park District and the Commission agreed upon changes to proposed LCP amendment No. 1-93. Rather than zoning all coastal properties within the city for preferred public park uses, the revised amendment No. 1-93 excluded what is now SNG's site from the park designation, thus permitting it to be developed. On April 10, 1996, the Commission unanimously approved amendment No. 1-93. The amendment became effective immediately upon the Commission's approval.

SNG exercised its option to purchase the former Lonestar site in mid-1996, and closed on the property in early 1997. At SNG's request, on April 16, 1997, Sand City approved another amendment to its LCP to allow the land use designations on the SNG site to be mixed, rather than segregated, while maintaining the uses and densities permitted by the LCP. The Commission staff recommended that the amendment be approved with certain suggested modifications. Although the staff's analysis of the amendment discussed ESHA issues, it did not state or even suggest that SNG's site might be an ESHA. In fact, the Commission's staff found that the proposed amendment

"do[es] not raise an issue of conformance with Coastal Act habitat protection policies." The Commission then approved this amendment (No. 2-97) on June 11, 1997.

### SNG's Project

SNG's proposed project is called Monterey Bay Shores Resort. As initially proposed, the project contained 597 units, but SNG later reduced this number to 495. The project submitted was a mixed-use development that provided for timeshare units, a hotel, residential condominiums, and visitor-serving residential units, as well as a conference center. The project also contained plans for habitat restoration and dune stabilization.

SNG then applied to Sand City for issuance of a CDP for the project. On December 1, 1998, Sand City's city council adopted a resolution approving the CDP. The CDP approval was subject to 59 conditions that SNG would have to meet before it could begin construction at the site. The city council specifically found that the project as conditioned was consistent with Sand City's certified LCP.

### Appeal of the CDP to the Commission

The Sierra Club and two members of the Commission appealed the issuance of the CDP to the Commission. (See § 30625, subd. (a).) On February 3, 1999, the Commission determined that the appeal raised a "substantial issue" as to whether the project conformed to the Sand City LCP. (§ 30625, subd. (b).) As a result, the Commission was required to consider the application at a de novo public hearing. (§ 30621, subd. (a); Cal. Code Regs., tit. 14, § 13115, subd. (b).)

During the administrative appeal process, the Commission's staff reviewed the project in detail and prepared a report that recommended that the Commission deny a CDP for the project on the grounds that the proposed development was inconsistent with Sand City's certified LCP as well as Coastal Act policies regarding public access and recreation. Relying on the general policies regarding ESHA's in Sand City's LCP, the staff report declared that the entire project site was an ESHA. The staff report made no mention of the specific finding in section 4.2.4 of Sand City's certified LUP that there were no ESHA's in the area west of Highway 1, the area that

includes SNG's site. The staff report went on to conclude that SNG's project did not adequately protect environmentally sensitive dune habitat.

In addition to its ESHA findings, the Commission staff concluded that the project did not meet LCP requirements regarding water supply. In particular, the staff report noted that the project required a water distribution permit from the Montgomery Peninsula Water Management District (the Water District) and that the Water District had denied the permit on October 26, 2000.

After a hearing on December 14, 2000, the Commission voted to deny SNG's CDP based on the findings in the staff report.[3]

### SNG's Action

SNG subsequently filed a combined petition for writ of administrative mandamus and complaint against the State of California and the Commission, a petition which it later amended. Sierra Club intervened in the case. SNG's petition asserted seven causes of action, including claims for administrative mandamus under Code of Civil Procedure section 1094.5, inverse condemnation, breach of contract, and estoppel. The latter four claims are before us on appeal.

On December 2, 2005, the trial court denied SNG's petition for writ of administrative mandamus, based on the Commission's findings that there were inadequate groundwater resources for the project. Although the trial court did entertain argument on the legality of the Commission's ESHA designation, it did not rule on that issue.

On February 8, 2006, the trial court granted the Commission's motion for summary adjudication of SNG's claims for inverse condemnation, breach of contract, and estoppel. As to the claim for inverse condemnation, the trial court concluded that it was not yet ripe. Citing *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309 [82 Cal.Rptr.2d 649] (*Toigo*), the trial court noted that SNG's 495-unit project was SNG's first application for development of its site. The trial court suggested that the Commission had not made a final decision as to the uses to which SNG's site could be put and that the proper course for SNG was to modify its project and reapply for a permit. (See *Toigo, supra*, at pp. 325–326 [no "final decision" for takings purposes unless governmental entity has rejected a formal development plan and denied

---

[3] Under the Commission's rules, "[u]nless otherwise specified at the time of the vote, an action taken consistent with the staff recommendation shall be deemed to have been taken on the basis of, and to have adopted, the reasons, findings and conclusions set forth in the staff report as modified by staff at the hearing." (Cal. Code Regs., tit. 14, § 13096, subd. (b).)

property owner's request for a variance or exception from controlling regulations].) Addressing SNG's estoppel claim, the trial court concluded that such a claim is indistinguishable from a vested rights claim and that no such claim would lie until SNG had obtained a valid building permit or its equivalent. Finally, the trial court granted summary adjudication to the Commission on SNG's claim for breach of contract. Noting that SNG's breach of contract claim was grounded on the terms of the MOU, the trial court held that the MOU could not be read as binding the Commission to approve SNG's project and that, in any event, the Commission could not be bound by an agreement to which it was not a party.[4]

On February 24, 2006, SNG moved to remand the matter to the Commission based on what it described as "newly produced evidence." (See Code Civ. Proc., § 1094.5, subd. (e).) The alleged newly discovered evidence was a final judgment of the Monterey County Superior Court in *California American Water v. City of Seaside* (Super. Ct. Monterey County, 2006, No. M66343) (*Cal-Am*). SNG claimed that the *Cal-Am* decision had established that SNG had more than sufficient water for the project. On April 17, 2006, the trial court denied SNG's motion to remand.

On March 1, 2006, SNG voluntarily dismissed its remaining causes of action. The trial court entered separate judgments for the Commission and for the Sierra Club. SNG then filed a timely appeal from those judgments.

### DISCUSSION

In this court, SNG attacks three of the trial court's orders: (1) the denial of SNG's petition for writ of administrative mandamus; (2) the denial of SNG's motion to remand; and (3) the grant of summary adjudication to the Commission. We will address SNG's contentions on each of these issues in turn.

### I. *SNG Was Entitled to Issuance of a Writ of Administrative Mandamus.*

SNG contends that the trial court erred in denying its petition for writ of administrative mandamus. SNG's principal argument on this point is that the Coastal Act grants the Commission no statutory authority to declare SNG's site an ESHA during the administrative appeal from Sand City's grant of a CDP.

In its responsive brief, the Commission does not address SNG's arguments regarding its statutory authority to declare SNG's site an ESHA. Although the

---

[4] SNG later sought reconsideration of the order granting summary adjudication on the basis of the decision in *Dunn v. County of Santa Barbara* (2006) 135 Cal.App.4th 1281 [38 Cal.Rptr.3d 316]. After granting reconsideration, the trial court affirmed its grant of summary adjudication to the Commission.

Commission acknowledges that SNG has raised such a challenge,[5] the Commission declines to address the issue. Instead, the Commission argues only that a decision on this question would amount to an "advisory opinion" and that substantial evidence supports its "finding" that SNG's site is an ESHA.[6] Regrettably, we are therefore left to address SNG's arguments regarding the Commission's statutory authority without the benefit of the Commission's written views.[7]

## A. Standard of Review

Relying on various provisions of the Coastal Act, SNG contends that the Commission has exceeded the jurisdiction granted to it by that statute. Where a party alleges that the Commission has acted beyond its statutory jurisdiction, it may challenge the agency's order or decision in an action for administrative mandamus under Code of Civil Procedure section 1094.5. (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 248 [115 Cal.Rptr. 497, 524 P.2d 1281].) In such an action, the court's inquiry extends to determining whether the agency acted in excess of its jurisdiction or abused its discretion by not proceeding in the manner required by law. (Code Civ. Proc., § 1094.5, subd. (b); *Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1343 [44 Cal.Rptr.3d 867] (*Schneider*).)

When the determination of an administrative agency's jurisdiction involves a question of statutory interpretation, "the issue of whether the agency proceeded in excess of its jurisdiction is a question of law." (*Schneider, supra,* 140 Cal.App.4th at p. 1344.) As the California Supreme Court has explained, "[a] court does not . . . defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*).) We therefore review de novo whether the Coastal Act empowers the Commission to designate property as ESHA during the administrative appeal from a local government's grant of a CDP.

---

[5] The Commission's brief is unequivocal on this point. In a footnote, the Commission states: "*Throughout its brief,* SNG asserts that the Commission improperly found that [SNG's] site was environmentally sensitive habitat . . . ." (Italics added.)

[6] The Commission adopted the same approach in the court below. In its brief opposing SNG's petition for writ of mandate, the Commission did not respond to SNG's contention that it lacked authority under the Coastal Act to make an ESHA designation.

[7] On January 11, 2008, this court issued an order requesting that the parties address certain questions at oral argument. Among other questions, we requested that the parties identify any statute granting the Commission the authority to designate property as an ESHA in an appeal from a local government's grant of a CDP. We also asked whether SNG's property had ever been designated an ESHA in either Sand City's certified LCP or in any certified amendment thereto.

## B. *The Commission's Purported ESHA Designation Is "Final" and the Matter Is Ripe for Judicial Review.*

Although the Commission does not directly confront SNG's challenge to its statutory authority, it does contend generally that a decision on this issue would be premature. The Commission appears to argue that its ESHA designation is not yet final because the Commission has not made "the requisite definitive pronouncement regarding the potential use of SNG's property." The Commission thus urges that the trial court correctly refused to rule on what the Commission calls "specified determinations regarding [SNG's] property." According to the Commission, "those determinations are not final and hence not ripe for judicial review in an inverse condemnation claim."[8] The Commission relies on the doctrine of exhaustion of administrative remedies in claiming that the matter is not ripe for review. We disagree with the Commission, because we conclude that the agency's purported ESHA designation is both final and ripe for review.

### 1. *Finality and Exhaustion of Administrative Remedies*

Code of Civil Procedure section 1094.5, subdivision (a) permits courts to review only a "final administrative order or decision" made in an adjudicatory or quasi-judicial proceeding. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 566–567 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; see 1 Cal. Administrative Mandamus (Cont.Ed.Bar 3d ed. 2007) § 3.19, p. 60 ["Under CCP § 1094.5(a), a writ of administrative mandamus may be issued to review an administrative decision *only if it is final.*" (italics added)].) The need for a "final" decision is considered an aspect of the requirement that a party exhaust its administrative remedies prior to filing suit. (1 Cal. Administrative Mandamus, *supra*, § 3.19, p. 60.) Here, the Commission essentially contends that a decision on SNG's challenge to the Commission's authority to designate ESHA would be premature because there has been no final decision on the kind of development that might be permitted on SNG's site.

The Commission's argument overlooks the fact that this appeal involves two *separate* administrative decisions—the Commission's purported ESHA designation, on the one hand, and the permitting decision, on the other. The two decisions are of an entirely different character. Amending an LCP, by declaring certain property an ESHA, is a *legislative* act. (*Yost v. Thomas*

---

[8] SNG contends that it is entitled to a judicial determination of the validity of the Commission's ESHA designation under *Hensler v. City of Glendale* (1994) 8 Cal.4th 1 [32 Cal.Rptr.2d 244, 876 P.2d 1043], arguing that the *Hensler* decision makes such a determination a jurisdictional prerequisite to the trial court's hearing of the Commission's motion for summary adjudication. We need not test the soundness of this theory, because review is proper under Code of Civil Procedure section 1094.5.

(1984) 36 Cal.3d 561, 570–571 [205 Cal.Rptr. 801, 685 P.2d 1152] (*Yost*); *San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 537 [45 Cal.Rptr.2d 117].) In contrast, where the Commission hears an administrative appeal from a local government's issuance of a CDP, the Commission is acting in a *quasi-judicial* capacity. (See, e.g., *City of Coronado v. California Coastal Zone Conservation Com.* (1977) 69 Cal.App.3d 570, 574 [138 Cal.Rptr. 241]; see also *Pacifica Corp. v. City of Camarillo* (1983) 149 Cal.App.3d 168, 177 [196 Cal.Rptr. 670] ["the courts have uniformly held that the coastal permit process is adjudicatory . . ."].) That the Commission's quasi-judicial permitting process may not have run its course says nothing about the finality of the Commission's purported ESHA designation.[9] It may be that there has been no final decision as to the uses to which SNG's property may be put (*Toigo, supra*, 70 Cal.App.4th at p. 325), but there has certainly been a final determination by the Commission that the property is an ESHA.

■ Even if the two administrative decisions were not entirely separate, SNG would be excused from exhausting its administrative remedies. In this case, SNG attacks the Commission's jurisdiction by contending that the Coastal Act grants the Commission no authority to designate property as ESHA in the context of an appeal to the Commission from a local government's grant of a CDP. In such cases, the courts have held that the "administrative jurisdiction exception to the exhaustion doctrine applies . . . ." (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1081–1083 [29 Cal.Rptr.3d 234, 112 P.3d 623] (*Coachella Valley*); see *Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 191 [80 Cal.Rptr.2d 562] ["The rule of exhaustion of administrative remedies does not apply where the subject matter lies outside the administrative agency's jurisdiction."].) Our high court explained in *Coachella Valley* that a court may entertain a claim that an agency lacks jurisdiction before the agency proceedings have run their course if three factors favor review. (*Coachella Valley, supra*, at p. 1082.) The court must

---

[9] As a consequence, the Commission's assertion that the record supports its finding that SNG's site is an ESHA puts the cart before the horse, for the argument necessarily assumes that the Commission possessed the statutory authority to make the ESHA designation in the first place. A decision on the Commission's statutory authority "necessarily precedes the issue of whether the [Commission's] findings . . . would be supported by substantial evidence." (*Sierra Club v. Superior Court* (1985) 168 Cal.App.3d 1138, 1145–1146 [214 Cal.Rptr. 740] [challenge to the correctness of legal standard applied by the Commission is a legal issue as to whether Commission proceeded in the manner required by law; decision on that legal issue must precede substantial evidence review].)

The finality of the ESHA designation is not affected by the possibility that the Commission might, at some future date, revise its determination. "If the possibility . . . of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule . . . would ever be final as a matter of law." (*General Elec. Co. v. E.P.A.* (D.C. Cir. 2002) 351 U.S. App.D.C. 291 [290 F.3d 377, 380].)

consider: (1) the injury or burden that exhaustion will impose; (2) the strength of the legal argument that the agency lacks jurisdiction; and (3) the extent to which agency expertise may aid in resolving the jurisdictional issue. (*Ibid.*) Here, all three factors militate in favor of entertaining SNG's claim.

■ First, failure to review the issue of the Commission's statutory authority will impose significant burdens on SNG. If, as the Commission claims, SNG's site is an ESHA, the site is subject to the development constraints of section 30240, which permits "only uses dependent on [habitat] resources." (§ 30240, subd. (a).) And, if the ESHA designation is proper, those constraints are applicable now. A site's status as an ESHA places very significant limitations on permissible development. (See *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 507 [83 Cal.Rptr.2d 850] (*Bolsa Chica*) ["the terms of [§ 30240] protect habitat values by placing strict limits on the uses which may occur in an ESHA"]; *Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 611, 617 [15 Cal.Rptr.2d 779] (*Sierra Club*) [stating that residential development is prohibited in an ESHA].) Any future development proposal that SNG might submit will be limited to resource-dependent uses. Thus, whether "through increased delay or project modification, the [ESHA designation] directly affect[s] the investment and project development choices of those whose activities are subject to the [designation]." (*National Ass'n of Home v. U.S. Army Corps* (D.C. Cir. 2005) 368 U.S. App.D.C. 23 [417 F.3d 1272, 1280] [Army Corps' decision to issue "nationwide permits" held final where it would have effect of causing builders either to put their projects on hold and seek individual permits, or modify their projects to satisfy conditions of nationwide permits].) This factor thus weighs in favor of judicial intervention.

Second, as we explain in part I.C., *post*, SNG makes a strong and persuasive argument that the Commission has no statutory authority to make the ESHA designation in the context of a permit appeal. In fact, as we will show, not only does the Commission lack statutory authority for its action, but in making its ESHA designation, it also intruded upon powers that the Coastal Act expressly allocates to local governments. This factor therefore also weighs in favor of excusing exhaustion.

Finally, this issue is not one that would benefit from application of administrative expertise. Here, "the issues are purely legal and of a kind within the expertise of [the] courts . . . ." (*Coachella Valley, supra*, 35 Cal.4th at p. 1083.) As we noted in discussing our standard of review, "the issue of whether the agency proceeded in excess of its jurisdiction is a question of law . . ." (*Schneider, supra*, 140 Cal.App.4th at p. 1344), and is one on which we do not defer to the Commission's views. (*Yamaha, supra*, 19 Cal.4th at p. 11, fn. 4; see also *Bolsa Chica, supra*, 71 Cal.App.4th at p. 507 [court

owed no deference to statutory interpretation adopted by Commission in approving an LCP].) This factor also favors review.

Accordingly, because all three factors favor judicial intervention at this time, any failure by SNG to exhaust administrative remedies is excused. (*Coachella Valley, supra*, 35 Cal.4th at p. 1083.)

### 2. *Ripeness*

■ We also have no difficulty concluding that this issue is ripe for review. To determine whether an issue is ripe for review, we evaluate two questions: the fitness of the issue for judicial decision and the hardship that may result from withholding court consideration. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171 [188 Cal.Rptr. 104, 655 P.2d 306].) We are persuaded that the issue of the Commission's statutory authority is fit for judicial decision. As we indicated above, whether the Coastal Act grants the Commission the power to declare SNG's site an ESHA during an administrative appeal from the grant of a CDP is a purely legal issue. "Resolution of this issue requires an interpretation of the [Coastal] Act, upon which the facts in this case will have little bearing." (*Hayward Area Planning Assn. v. Alameda County Transportation Authority* (1999) 72 Cal.App.4th 95, 103 [84 Cal.Rptr.2d 744]; see also *Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1723 [45 Cal.Rptr.2d 752] [action for declaratory relief ripe when the parties "dispute whether a public entity has engaged in conduct or established policies in violation of applicable law"].) "The legality *vel non* of the [Commission's action] will not change from case to case or become clearer in a concrete setting." (*National Ass'n Home Buil. v. U.S. Army Corp.* (D.C. Cir. 2006) 370 U.S. App.D.C. 137 [440 F.3d 459, 464].) Such a purely legal challenge to the Commission's authority is therefore fit for decision now. (*Ibid.* [purely legal challenge to agency action is presumptively reviewable].) In addition, as we explained in our discussion of the administrative jurisdiction exception to the exhaustion doctrine, withholding decision would impose a significant hardship on SNG. (See *id.*, 440 F.3d at p. 465 [hardship shown where agency rule would confront builders with choice of applying for permit of activities builders claimed were beyond agency's jurisdiction or face penalties for failing to do so].) The question is therefore ripe for judicial review.

### C. *The Commission Acted in Excess of Its Jurisdiction.*

■ SNG asserts that the Commission has no authority under the Coastal Act to designate its property as ESHA in the course of a permit appeal. SNG contends that the ESHA designation effected an amendment of the Sand City LCP and that the Coastal Act assigns the task of drafting and amending the

content of an LCP exclusively to local government. SNG's position is that the Coastal Act grants to local governments the power to draft their own LCP's and to determine the content thereof. SNG contends that the Commission's role is limited to determining whether a local government's LCP complies with the provisions of the Coastal Act. Our examination of the relevant provisions of the Coastal Act compels us to conclude that SNG is correct.

### 1. *General Principles*

■ The Commission, like all administrative agencies, has no inherent powers; it possesses only those powers that have been granted to it by the state Constitution or by statute. (See *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299–300 [105 Cal.Rptr.2d 636, 20 P.3d 533]; *State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 750 [16 Cal.Rptr.2d 727]; 3 Koch, Administrative Law and Practice (2d ed. 1997) § 12.13[1](a), pp. 170–171 ["Administrative agencies derive their power and authority from other sources . . . and hence agencies have only such authority as is delegated by the legislature."].) "[A]n agency literally has *no power to act* . . . unless and until [the Legislature] confers power upon it." (*Louisiana Public Service Comm'n v. FCC* (1986) 476 U.S. 355, 374 [90 L.Ed.2d 369, 106 S.Ct. 1890], italics added (*LPSC*).) That an agency has been granted *some* authority to act within a given area does not mean that it enjoys *plenary* authority to act in that area. (*Railway Labor Exec. Ass'n v. National Mediation Bd.* (D.C. Cir. 1994) 308 U.S. App.D.C. 9 [29 F.3d 655, 670] (en banc).) As a consequence, if the Commission takes action that is inconsistent with, or that simply is not authorized by, the Coastal Act, then its action is void. (See *Schneider, supra*, 140 Cal.App.4th at p. 1348; accord, *BMW of North America, Inc. v. New Motor Vehicle Bd.* (1984) 162 Cal.App.3d 980, 994 [209 Cal.Rptr. 50] ["It is fundamental that an administrative agency has only such power as has been conferred upon it by the constitution or by statute and an act in excess of the power conferred upon the agency is void."].)

Our task is thus to determine whether the Commission's ESHA designation exceeded the Commission's statutory grant of authority under the Coastal Act. (See *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1479 [277 Cal.Rptr. 481].) To do so, we look to the relevant provisions of that statute.

### 2. *The Coastal Act*

The Coastal Act sets out a process by which LCP's are prepared, adopted, certified, and periodically reviewed. It also permits their amendment. As we shall show, the Coastal Act expressly vests in local governments, rather than the Commission, the responsibility for determining the content of their

LCP's. Thus, we conclude that the Commission has no statutory authority to amend an LCP during the CDP appeal process.

### a. *Preparation and Content of the LCP*

■ The Coastal Act requires that each local government lying, in whole or in part, within the coastal zone prepare an LCP for that portion of the coastal zone under the local government's jurisdiction, unless the local government asks the Commission to prepare the LCP. (§ 30500, subd. (a).) An LCP consists of two principal components: an LUP, and "implementing actions," such as zoning ordinances and maps. (See § 30108.6 [LCP consists of "a local government's (a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions"]; see also § 30108.4 [defining "implementing actions"]; § 30108.5 [defining "land use plan"].) Under the statute, "[t]he *precise content* of each local coastal program shall be determined *by the local government* . . . in full consultation with the commission and with full public participation." (§ 30500, subd. (c), italics added.)

### b. *Submission of the LCP for Commission Certification*

■ The local government must then submit the proposed LCP to the Commission for certification. (§ 30510.) The local government may choose to submit its entire proposed LCP at once, or in phases (in which case the LUP is processed first, followed by the implementing actions), or in separate geographic units. (§ 30511, subds. (a)–(c).) The Commission must then review the land use portion of the LCP under specified procedures. (§ 30512, subd. (a).) If the Commission finds that the LUP meets the requirements of chapter 3 of the Coastal Act, and is in conformance with the policies of that chapter, then it must certify it. (§ 30512, subd. (c) [Commission "shall certify" LUP's meeting chapter 3 requirements].) The Commission's review of the LUP is limited by statute to the Commission's "administrative determination that the land use plan . . . does, or does not, conform with the requirements of Chapter 3 (commencing with Section 30200). *In making this review, the commission is not authorized by any provision of this division to diminish or abridge the authority of a local government to adopt and establish, by ordinance, the precise content of its land use plan.*" (§ 30512.2, subd. (a), italics added.) Similarly, the Commission may only reject the local government's implementing actions "on the grounds that they do not conform with, or are inadequate to carry out, the provisions of the certified land use plan." (§ 30513.) Quoting with approval *City of Chula Vista v. Superior Court* (1982) 133 Cal.App.3d 472, 478 [183 Cal.Rptr. 909], our high court noted in *Yost* that " 'the Commission in approving or disapproving an LCP does not create or originate any land use rules and regulations. It can approve or

disapprove *but it cannot itself draft any part of the coastal plan.'* " (*Yost, supra*, 36 Cal.3d at p. 572, italics added.)

### c. *Delegation of Development Review Authority After Certification*

█ Once the Commission approves the local government's LCP, development review authority "shall no longer be exercised by the commission over any new development proposed within the area to which the certified local coastal program, or any portion thereof, applies and shall at that time be delegated to the local government that is implementing the local coastal program or any portion thereof." (§ 30519, subd. (a).) After certification, the local government has discretion to choose what actions it will take to implement its LCP. (*Yost, supra*, 36 Cal.3d at pp. 572–573.) Thus, for example, the Coastal Act "does not dictate that a local government must build a hotel and conference center—that decision is made by the local government. It merely requires local governments to comply with specific policies— but the decision of whether to build a hotel or whether to designate an area for a park remains with the local government." (36 Cal.3d at p. 573.)

Once the LCP is certified, "the Commission's role in the permit process for coastal development [is] to hear appeals from decisions by [the local government] to grant or deny permits." (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1354, fn. 5 [56 Cal.Rptr.3d 591], citing § 30603.) The Commission's jurisdiction in such appeals, however, is limited. (*City of Half Moon Bay v. Superior Court* (2003) 106 Cal.App.4th 795, 804 [131 Cal.Rptr.2d 213].) As relevant here, the Coastal Act limits the grounds for a CDP appeal "to an allegation that the development does not conform to the standards set forth *in the certified local coastal program . . . .*" (§ 30603, subd. (b)(1), italics added.)

### d. *"Periodic Review" and Amendment of the LCP*

█ The Coastal Act requires the Commission to review every certified LCP at least once every five years to determine whether the program is being implemented in conformity with Coastal Act policies. (§ 30519.5, subd. (a).) If the Commission finds that a certified LCP is not being carried out in conformity with the Coastal Act, it must recommend corrective actions to the local government, which may include recommended amendments to the certified LCP. (§ 30519.5, subd. (a).) Even in these circumstances, however, the statute gives the Commission no power either to make the amendments itself or to compel the local government to make them. Instead, the law requires the affected local government to report to the Commission the reasons that it has not taken the recommended corrective action. (§ 30519.5,

subd. (b).) The Commission may then review the local government's report and "where appropriate, report to the Legislature and recommend legislative action necessary to assure effective implementation of the relevant policy or policies of [the Coastal Act]." (*Ibid.*)

The Commission's role in the amendment process is similarly circumscribed. The Coastal Act provides for amendment of a certified LCP but once again makes clear that the LCP "may be amended by the appropriate local government," subject to review by the Commission. (§ 30514, subd. (a).)

### 3. *By Declaring SNG's Site an ESHA, the Commission Exceeded Its Statutory Authority, Improperly Assumed Powers Reserved to Local Government, and Contradicted the Terms of the Certified LCP.*

Nothing in the statutory scheme outlined above grants the Commission the authority to make changes to the content of Sand City's LCP during an appeal from Sand City's grant of a CDP. This lack of statutory authority alone would suffice to invalidate the Commission's action, because absent a delegation of authority from the Legislature, the Commission "literally has no power to act." (*LPSC, supra,* 476 U.S. at p. 374.) But the Commission's action in this case is even less justifiable for at least three other reasons.

First, the Commission's action clearly exceeded an express limitation on its jurisdiction in permit appeals. The Coastal Act limits the grounds for such an appeal to an allegation that the development does not conform to the standards set forth in the certified LCP. (§ 30603, subd. (b)(1).) In denying SNG's permit (at least in part) based on its unlawful ESHA designation, the Commission imposed additional standards not found in Sand City's LCP. SNG was entitled to have its development proposal judged by the standards of the certified LCP in effect at the time of its application.[10] (See *Toigo, supra,* 70 Cal.App.4th at p. 318 [pertinent question is whether proposed development is prohibited by the regulations and zoning in effect at time application is made].)

Second, the Commission has purported to exercise powers that the Legislature has expressly allocated to local government, which has decreed that

---

[10] To the extent that the Commission appears to argue that its ESHA designation is somehow justified because Sand City's LCP was outdated, that argument was answered by the California Supreme Court in *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553 [276 Cal.Rptr. 410, 801 P.2d 1161]. In that case, the court held that in approving a development project a local government was not required to demonstrate that "the conclusions in the LCP still 'relate to current conditions.' " (*Id.* at p. 574.) The court explained that requiring "a reexamination of basic land-use policy with every permit application would impose an unnecessary and wasteful burden on local governments." (*Ibid.*)

LCP's may be amended "by the appropriate local government." (§ 30514, subd. (a).) By declaring the site an ESHA, the Commission has impermissibly attempted to amend part of Sand City's LCP. (Cf. *Yost, supra*, 36 Cal.3d at p. 572 [Commission cannot draft any part of coastal plan].)

Third, the Commission's ESHA designation actually contradicts the terms of the certified LCP itself. The Commission's staff concluded that SNG's site was ESHA on the basis of general LCP policies regarding ESHA protection. But that conclusion cannot be reconciled with the specific findings in section 4.2.4 of Sand City's certified LUP that there were *no* ESHA's in the area west of Highway 1, where SNG's site is located. The Commission's staff cited sections 4.3.20 and 4.3.21 of the certified LUP to justify its conclusion, but it failed to note that while LUP section 4.3.20 requires that ESHA's be protected, it is directed specifically at the ESHA's mapped in the LCP. Nor did the staff report mention LUP section 4.3.19, which requires Sand City to "[d]esignate general areas as sensitive habitats *as shown on the Coastal Resources Map (Figure 7)*." (Italics added.) It is undisputed that SNG's site is not shown on the Coastal Resources Map. In fact, the Commission explicitly conceded this point below in its opposition to SNG's petition for writ of mandate. The Commission explained that Sand City's LCP "attempted to map 'generalized locations' of habitat areas. [Citation.] *None of those areas are located on SNG's site,* [citation] and the LCP opined that there was no natural habitat seaward of Highway 1." (Italics added.) The Commission's ESHA designation simply cannot be squared with the plain terms of Sand City's LCP.

### 4. *The Commission's Contentions at Oral Argument*

Finally, we address the principal points raised by the Commission's counsel at oral argument.

First, counsel cited the Second Appellate District's recent decision in *LT-WR, L.L.C. v. California Coastal Com.* (2007) 152 Cal.App.4th 770 [60 Cal.Rptr.3d 417] (*LT-WR*) to support the Commission's claim that it possessed the authority to make an ESHA designation in the context of a permit appeal. In *LT-WR*, the court concluded that the fact that property was not mapped as ESHA in the controlling LUP did not preclude it from being designated as ESHA during a permit appeal. (*Id.* at p. 793.) *LT-WR* is distinguishable from the case before us because the LUP at issue in *LT-WR* required the designation not only of ESHA's that had been mapped, but also of " 'any undesignated areas which meet the criteria and which are identified through the biotic review process or other means . . . .' " (*Ibid.*, italics omitted.) Sand City's LUP contains no comparable provision. Furthermore, the Second Appellate District's opinion in *LT-WR* does not even discuss the question presented here—whether the Coastal Act

provides the Commission with statutory authority to declare property an ESHA when the Commission is considering an appeal from a local government's grant of a CDP. It therefore provides no guidance on the issue of the Commission's statutory authority.[11] (See, e.g., *In re M.M.* (2007) 154 Cal.App.4th 897, 910 [65 Cal.Rptr.3d 273] [fact that courts in prior cases exercised jurisdiction to review particular orders provides no support for conclusion that court actually possessed jurisdiction, because jurisdictional issue was not considered], citing *American Portland Cement Alliance v. E.P.A.* (D.C. Cir. 1996) 322 U.S. App.D.C. 99 [101 F.3d 772, 775–776].)

Second, counsel for the Commission relied on Sand City's LCP amendment No. 2-97 as support for the Commission's purported ESHA designation. Counsel for the Commission did not claim (nor could he have) that amendment No. 2-97 actually designated SNG's property as an ESHA. Instead, counsel asserted that the amendment put SNG on notice that its property was "subject to review and *potential identification* as ESHA." (Italics added.) Counsel thus implicitly conceded that the amendment itself did not make SNG's property an ESHA. Indeed, any such argument would fly in the face of the text of the amendment as unanimously approved by the Commission. The modified amendment specifically approved the intermixing of uses on SNG's site, and it contemplated a maximum of 375 "hotel/vacation club/timeshare" units, 100 visitor-serving residential units, and 175 medium density residential units, as well as several acres devoted to public recreation. As the Commission's district director explained at the Commission hearing on the proposed amendment, "this amendment would allow the intermixing of uses, and the types of uses that [SNG is] proposing to go forward with." In short, the level of development expressly permitted by amendment No. 2-97 belies the Commission's assertion that the amendment somehow presaged the Commission's ESHA designation. (See *Sierra Club, supra*, 12 Cal.App.4th at p. 617 [residential development in an ESHA is "non-resource-dependent . . . development in violation of the [Coastal] Act"].)

Third, citing *Toigo, supra*, 70 Cal.App.4th 309, counsel for the Commission also argued that the question of the Commission's statutory authority is not ripe for review. As we have explained in part I.B.2., *ante*, SNG's challenge to the Commission's authority is presently ripe. We need add only that *Toigo* held that a *takings claim* arising out of a town's denial of a subdivision application and subsequent rezoning of the subject property was not ripe for judicial review. (*Toigo, supra*, at pp. 324–332.) The takings claim

---

[11] The sole statute cited by Commission counsel at oral argument, section 30625, subdivision (c), states only that "[d]ecisions of the commission, where applicable, shall guide local governments . . . in their future actions under this division." (§ 30625, subd. (c).) We decline to hypothesize about what this subdivision may mean, but it cannot reasonably be read to grant the Commission the legislative power to amend a local government's certified LCP when the Commission hears an appeal from a local government's grant of a CDP.

was unripe because the property owners had neither submitted a lower density proposal that the town might approve nor shown that such a reapplication would be futile. (*Id.* at pp. 326–332.) In contrast, the *Toigo* court did consider the merits of the property owners' challenge to the trial court's denial of their petition for administrative mandamus. In its discussion of that issue, the court noted that, unlike SNG in this case, the property owners did not challenge the statutory authority of the town to take the actions it did. (See *id.* at p. 318 [property owners did not assert that town failed to comply with statutory time guidelines and had not questioned "the legality of the rezoning"].) Unlike the property owners in *Toigo,* SNG here challenges the Commission's very authority to designate SNG's property as an ESHA during the administrative appeal from Sand City's grant of a CDP.

Fourth, the Commission's counsel contended that SNG had forfeited the statutory authority issue by failing to challenge the Commission's factual findings in support of the purported ESHA designation. As we explained in footnote 9, *ante*, before we may address whether the Commission's purported ESHA designation is supported by substantial evidence, we must necessarily resolve the question of whether the Commission possessed the statutory authority to make the ESHA designation in the first instance. Put another way, the *factual* evidence marshaled by the Commission to show that SNG's site is an ESHA has no bearing at all on the *legal* issue of whether the Coastal Act grants the Commission the authority to make such a designation in these circumstances. In any event, having declined to oppose SNG's statutory authority challenge either in its opposition to SNG's petition in the trial court or in its responsive brief in this court, the Commission is in a poor position to claim forfeiture.

For the foregoing reasons, we hold that in designating SNG's site an ESHA in the course of an appeal from Sand City's grant of a CDP, the Commission acted "without, or in excess of [its] jurisdiction."[12] (Code Civ. Proc., § 1094.5, subd. (b).)

### D. *Remedy*

In its opening brief, SNG requested that we remand the case to the trial court to compel it to make a finding on whether the SNG site was properly designated an ESHA. Having made that determination ourselves, no purpose would be served by having the superior court rule on the issue. Instead, we believe that the proper course is to reverse the superior court's denial of

---

[12] Obviously, we express no view on the question of whether the facts would justify classifying SNG's site as an ESHA under section 30240. It is sufficient for us to hold, as we do, that the Commission has no power to revise the content of Sand City's certified LCP when hearing an administrative appeal from the grant of a CDP.

SNG's petition for writ of administrative mandamus and to order the lower court to issue a peremptory writ commanding the Commission to vacate its decision and rehear SNG's permit application on the basis of the standards set forth in Sand City's certified LCP. (See *Schneider, supra*, 140 Cal.App.4th at p. 1350.)

Our colleagues in Division One applied a similar remedy in *Brooks v. State Personnel Bd.* (1990) 222 Cal.App.3d 1068 [272 Cal.Rptr. 292]. In that case, a university employee challenged his termination on the grounds that the university had improperly amended the charges against him after it issued its notice of dismissal. (*Id.* at p. 1071.) The court concluded that the Education Code provided no statutory authority for the amendment of disciplinary charges against the employee after the employee's termination had become effective and that the state personnel board therefore had no power to hear matter based on the amended charges. (222 Cal.App.3d at pp. 1074–1076.) The court remanded the matter to the trial court with instructions that it issue an order setting aside the order of the state personnel board and directing the board to reconsider the matter based on the charges set forth in the original notice of dismissal. (*Id.* at p. 1076.) We will do the same here.[13]

We now turn to the propriety of the superior court's grant of summary adjudication to the Commission on SNG's claims for breach of contract and estoppel.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## Disposition

The judgments are reversed insofar as they deny SNG's request for a writ of administrative mandamus, and the superior court is ordered to issue a peremptory writ commanding the Commission to vacate its decision and rehear the matter based on the standards set forth in Sand City's certified LCP. The judgments entered in favor of the Commission and the Sierra Club

---

[13] Because we order this matter remanded to the Commission, we need not address SNG's claim that the superior court erred in denying its motion to remand based on "newly produced evidence." Likewise, we need not examine SNG's claim for inverse condemnation, because that claim is based on the Commission's ESHA designation, which we have now set aside.

*See footnote, *ante*, page 402.

on SNG's claims for breach of contract and estoppel are affirmed. Each party shall bear its own costs on appeal. (Cal. Rules of Court, rule 8.276(a)(3).)

Jones, P. J., and Stevens, J.,* concurred.

A petition for a rehearing was denied February 20, 2008.

---

*Retired Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.