73 Cal.Rptr.3d 661 (2008)
160 Cal.App.4th 1517
The PEOPLE, Plaintiff and Respondent,
v.
Richard McKEE, Defendant and Appellant.
No. D050554.
Court of Appeal of California, Fourth District, Division One.
March 20, 2008.
*664 Steven M. Hinkle, under appointment by the Court of Appeal, Oceanside, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillett, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.
McDONALD, J.
Richard McKee appeals an order involuntarily committing him for an indeterminate term to the custody of the State Department of Mental Health (DMH) after a jury found him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (Welf. & Inst.Code, ง 6600 et seq.)[1] (the Act). McKee contends the order should be reversed because: (1) his indeterminate commitment pursuant to the Act, as amended in 2006, violated his federal constitutional rights to due process of law, against ex post facto laws, and to equal protection under the law; (2) the evidence is insufficient to support the finding he is an SVP; and (3) the trial court erred by refusing his proposed modification of a jury instruction.

*665 FACTUAL AND PROCEDURAL
BACKGROUND
On November 8, 2004, a petition was filed to establish McKee as an SVP within the meaning of the Act. The petition alleged McKee was "a person who has been convicted of a sexually violent offense against two or more victims for which he was sentenced and who has a diagnosed mental disorder that makes him a danger to the health and safety of others, in that it is likely he will engage in sexually violent predatory criminal behavior." It alleged he had been convicted of two counts of committing lewd and lascivious acts on a child under the age of 14 (Pen.Code, ง 288, subd. (a)). One victim was an 11-year-old girl and the other was an eight-year-old girl.[2] The petition requested that McKee be committed to the DMH's custody for a period of two years.
On February 16, 2007, McKee demurred to the petition on the ground that the Act, as amended on November 7, 2006, by the voters' passage of Proposition 83, was unconstitutional. The trial court overruled the demurrer.
On March 5, an amended petition was filed restating the original petition's factual allegations and requesting that McKee be committed to an indeterminate term pursuant to the amended Act. On March 12, following a five-day trial, the jury returned a verdict finding McKee was an SVP within the meaning of the Act. On March 13, the trial court issued an order committing McKee to the custody of the DMH for an indeterminate term pursuant to the Act. McKee timely filed a notice of appeal.

DISCUSSION

I

The Act and Proposition 83
The Act, as originally enacted as of January 1, 1996 (Stats.1995, ch. 763, ง 3), provided for the involuntary civil commitment for a two-year term of confinement and treatment of persons who, by a unanimous jury verdict after trial (former งง 6603, subd. (d), 6604), are found beyond a reasonable doubt to be an SVP (former ง 6604). (People v. Williams (2003) 31 Cal.4th 757, 764, 3 Cal.Rptr.3d 684, 74 P.3d 779; Hubbart v. Superior Court (1999) 19 Cal.4th 1138, 1143, 1147, 81 Cal.Rptr.2d 492, 969 P.2d 584 (Hubbart).) A person's commitment could not be extended beyond that two-year term unless a new petition was filed requesting a successive two-year commitment.[3] (Former งง 6604, 6604.1; Cooley v. Superior Court (2002) 29 Cal.4th 228, 243, fn. 5, 127 Cal.Rptr.2d 177, 57 P.3d 654; People v. Shields (2007) 155 Cal. App.4th 559, 562, 65 Cal.Rptr.3d 922.) On filing of a recommitment petition, a new jury trial would be conducted at which the People again had the burden to prove beyond a reasonable doubt that the person was currently an SVP. (Former งง 6604, 6605, subds. (d), (e); People, v. Munoz (2005) 129 Cal.App.4th 421, 429, 28 Cal. Rptr.3d 295["[A]n SVP extension hearing is not a review hearing.... An SVP extension hearing is a new and independent *666 proceeding at which ... the [People] must prove, the [committed person] meets the [SVP] criteria, including that he or she has a currently diagnosed mental disorder that renders the person dangerous."]; Cooley, at p. 243, fn. 5, 127 Cal.Rptr.2d 177, 57 P.3d 654; Shields, at p. 562, 65 Cal. Rptr.3d 922; People v. Roberge (2003) 29 Cal.4th 979, 984, 129 Cal.Rptr.2d 861, 62 P.3d 97.)
As originally enacted, an SVP was defined as "a person who has been convicted of a sexually violent offense against two or more victims for which he or she received a determinate sentence and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Former ง 6600, subd. (a).) A "sexually violent offense" included a Penal Code section 288 lewd act on a child under age 14. (Former ง 6600, subd. (b); Hubbart, supra, 19 Cal.4th at p. 1145, 81 Cal. Rptr.2d 492, 969 P.2d 584.) Under the Act, a person is "likely" to engage in sexually violent criminal behavior (i.e., reoffend) if he or she "presents a substantial danger, that is, a serious and well-founded risk, that he or she will commit such crimes if free in the community." (People v. Superior Court (Ghilotti) (2002) 27 Cal.4th 888, 922,119 Cal.Rptr.2d 1, 44 P.3d 949; see also People v. Roberge, 29 Cal.4th at pp. 988-989, 129 Cal.Rptr.2d 861, 62 P.3d 97.) The Act does not require proof the person "is more likely than not to reoffend." (Ghilotti at p. 923, 119 Cal. Rptr.2d 1, 44 P.3d 949.)
The Act is "designed to ensure that the committed person does not `remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness.' [Citation.]" (Hubbart, supra, 19 Cal.4th at p. 1177, 81 Cal.Rptr.2d 492, 969 P.2d 584.) The Act "therefore provides two ways a defendant can obtain review of his or her current mental condition to determine if civil confinement is still necessary. [First,] [s]ection 6608 permits a defendant to petition for conditional release to a community treatment program.... [Second,] [s]ection 6605 [requires] an annual review of a defendant's mental status that may lead to unconditional release." (People v. Cheek (2001) 25 Cal.4th 894, 898, 108 Cal.Rptr.2d 181, 24 P.3d 1204, fn. omitted.)
On November 7, 2006, California voters passed Proposition 83 (also known as "Jessica's Law"), amending the Act effective November 8. (People v. Shields, supra, 155 Cal.App.4th at pp. 562-563, 65 Cal.Rptr.3d 922.) Pursuant to Proposition 83, "former section 6604 was amended to eliminate the two-year term provision and to provide for an indeterminate term of confinement (subject to the SVP's right to petition for release). [Citations.]" (Shields, at p. 562, 65 Cal.Rptr.3d 922.)[4] Section 6604 of the Act now provides in relevant part: "If the *667 court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the [DMH] for appropriate treatment and confinement...." (Italics added.) Proposition 83 did not change section 6604's requirement that a person's commitment as an SVP be proved at trial beyond a reasonable doubt.[5] (ง 6604.) Under Proposition 83, section 6605 continues to require current examinations of a committed SVP at least once every year. (ง 6605, subd. (a).) However, Proposition 83 added new provisions to section 6605 regarding the DMH's obligations:
"(a) ... The annual report [following a current examination] shall include consideration of whether the committed person currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community. The [DMH] shall file this periodic report with the court that committed the person under this article. The report shall be in the form of a declaration and shall be prepared by a professionally qualified person. A copy of the report shall be served on the prosecuting agency involved in the initial commitment and upon the committed person. The person may retain, or if he or she is indigent and so requests, the court may appoint, a qualified expert or professional person to examine him or her, and the expert or professional person shall have access to all records concerning the person.

"(b) If the [DMH] determines that either: (1) the person's condition has so changed that the person no longer meets the definition of a sexually violent predator, or (2) conditional release to a less restrictive alternative is in the best interest of the person and conditions can be imposed that adequately protect the community, the director shall authorize the person to petition the court for conditional release to a less restrictive alternative or for an unconditional discharge. The petition shall be filed with the court and served upon the prosecuting agency responsible for the initial commitment. The court, upon receipt of the petition for conditional release to a less restrictive alternative or unconditional discharge, shall order a show cause hearing at which the court can consider the petition and any accompanying documentation provided by the medical director, the prosecuting attorney or the committed person." (Italics added to indicate language retained from original Act.)
Therefore, in the event the DMH determines a person is no longer an SVP, the DMH is required to authorize that person to file a petition for unconditional release or discharge. (ง 6605, subd. (b).) Proposition 83 did not amend the provisions regarding the court's consideration of a DMH-authorized petition for release. If, at a show cause hearing on that petition, the trial court determines there is probable cause to believe the person's mental disorder has so changed that that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged, the court must set an evidentiary *668 hearing (i.e., a trial) on the issue. (ง 6605, subd. (c).) Furthermore, section 6605, subdivision (d), continues to provide (without amendment by Proposition 83):
"At the [evidentiary] hearing, the committed person shall have the right to be present and shall be entitled to the benefit of all constitutional protections that were afforded to him or her at the initial commitment proceeding.... The committed person also shall have the right to demand a jury trial and to have experts evaluate him or her on his or her behalf. The court shall appoint an expert if the person is indigent and requests an appointment. The burden of proof at the hearing shall be on the state to prove beyond a reasonable doubt that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged."
If the court or jury finds in the committed person's favor, the person shall be unconditionally released and discharged. (ง 6605, subd. (e).)
In the event the DMH does not authorize the committed person to file a petition for release pursuant to section 6605, the person nevertheless may file a petition for conditional release for one year and subsequent unconditional discharge pursuant to section 6608 without the DMH's authorization in the same manner as before passage of Proposition 83.[6] (ง 6608, subd. (a) ["Nothing in this article shall prohibit the person who has been committed as a sexually violent predator from petitioning the court for conditional release or an unconditional discharge without the recommendation or concurrence of the [DMH]...."]; People v. Cheek, supra, 25 Cal.4th at p. 902, 108 Cal.Rptr.2d 181, 24 P.3d 1204 ["Section 6608, which provides for conditional release to a community treatment program, does not mention section 6605, and permits a defendant to be unconditionally released only after the defendant has spent a year in a conditional release program."].)[7] Section 6608, subdivision (i), was not amended by Proposition 83 and continues to provide with regard to hearings on a committed person's section 6608 petition for conditional release: "In any hearing authorized by this section, the petitioner shall have the burden of proof by a preponderance of the evidence."[8] (Italics *669 added.) After a trial court denies a section 6608 petition, "the person may not file a new application until one year has elapsed from the date of the denial." (ง 6608, subd. (h).)
Because Proposition 83 amended section 6604 to make an SVP's commitment term indeterminate (rather than a two-year term), a committed person now, in effect, "remains in custody until he successfully bears the burden of proving he is no longer an SVP or the [DMH] determines he no longer meets the definition of an SVP. [Citations.]" (Bourquez v. Superior Court (2007) 156 Cal.App.4th 1275, 1287, 68 Cal. Rptr.3d 142.)

II

Federal Constitutional Right to Due Process
McKee contends his involuntary commitment as an SVP under the Act, as amended by Proposition 83 in 2006, violated his federal constitutional right to due process of law.

A
"[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection. [Citations.]" (Addington v. Texas (1979) 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (Addington).) However, "[although freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' [citation], that liberty interest is not absolute." (Kansas v. Hendricks (1997) 521 U.S. 346, 356, 117 S.Ct. 2072, 138 L.Ed.2d 501.) Nevertheless, a state must have "a constitutionally adequate purpose for the confinement." (O'Connor v. Donaldson (1975) 422 U.S. 563, 574, 95 S.Ct. 2486, 45 L.Ed.2d 396.) Hendricks stated:
"The [United States Supreme] Court has recognized that an individual's constitutionally protected interest in avoiding physical restraint may be overridden even in the civil context: [ถ] `[T]he liberty interest secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly free from restraint. There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members.' [Citation.] [ถ] Accordingly, States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety. [Citations.]" (Hendricks, supra, 521 U.S. at pp. 356-357, 117 S.Ct. 2072.)
Hendricks concluded: "It thus cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty. [Citation.]" (Hendricks, supra, 521 U.S. at p. 357, 117 S.Ct. 2072.) In the context of civil commitment statutes, "[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness *670 with the proof of some additional factor, such as a `mental illness' or `mental abnormality.' [Citations.]" (Id. at p. 358, 117 S.Ct. 2072.)

B
McKee contends the Act, as amended by Proposition 83, violates the federal constitutional right to due process of law because it provides for an indefinite involuntary civil commitment without adequate safeguards to ensure only those persons with a current mental illness that makes him or her dangerous to the public continue to be confined. He argues a person committed as an SVP to an indeterminate term pursuant to section 6604 could, in effect, be detained for decades after he or she is no longer currently an SVP because the Act's provisions for release are inadequate. He argues that although a committed person may file a section 6608 petition for conditional release and subsequent unconditional discharge, section 6608, subdivision (i), unconstitutionally imposes on the petitioner the burden to prove by a preponderance of the evidence that he or she is entitled to such release. Because neither party cites, and we have not found, any case deciding this issue, we consider it to be one of first impression.
We first address the question of whether McKee's due process contention is ripe for judicial review. Although the People did not raise that question, we requested, and have. received and considered, supplemental briefing by the parties regarding whether McKee's due process and equal protection contentions are ripe for review to the extent those contentions rely on the burden of proof and other provisions of section 6608 that may apply to him only in the future. "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] ... It is in part designed to regulate the work-load of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decision-making is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. .On the other hand, the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question. [Citations.]" (Pacific Legal Foundation v. California Coastal Com. (1982) 33 Cal.3d 158, 170, 188 Cal.Rptr. 104, 655 P.2d 306 (Pacific Legal), italics added.) "`A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.]" (Id. at p. 171, 188 Cal.Rptr. 104, 655 P.2d 306, quoting California Water & Telephone Co. v. County of Los Angeles (1967) 253 Cal.App.2d 16, 22, 61 Cal.Rptr. 618.)
In determining whether a particular controversy was ripe for review, Pacific Legal considered two factors that federal courts (i.e., U.S. Const., art. Ill, ง 2, courts) evaluate in determining ripeness: "`The [ripeness] problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' [Citation.]" (Pacific Legal, supra, 33 Cal.3d at p. 171, 188 Cal.Rptr. 104, 655 P.2d 306, italics omitted, quoting Abbott Laboratories v. Gardner (1967) 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (Abbott).) Assuming arguendo Pacific Legal adopted the Abbott test for determining ripeness *671 for review by California courts, we conclude both factors support our review of McKee's due process and equal protection constitutional contentions in this appeal.[9]
Regarding the first Abbott factor, both constitutional issues are fit for judicial decision. As noted above, McKee argues his indefinite involuntary civil commitment is unconstitutional because the Act, as amended by Proposition 83, provides inadequate safeguards for his future release when he is no longer an SVP. In particular, he argues section 6608's provisions regarding future petitions for conditional release without DMH authorization deprive him of his constitutional rights to due process and equal protection, as discussed in more detail below. Therefore, McKee's challenge to his indefinite term of commitment pursuant to section 6604 cannot be viewed in isolation without concurrent consideration of the Act's comprehensive scheme for annual reviews and petitions for release (including ง 6608), which he asserts is inadequate. Because he is, in effect, making a facial challenge to the provisions of section 6608, the further development of facts (e.g., by awaiting a future ง 6608 petition for release) will not aid us in deciding those issues. His facial due process and equal protection constitutional challenges of the Act, as amended by Proposition 83, are purely legal ones and additional facts that may arise in the future will not aid us in making our decision. (Abbott, supra, 387 U.S. at p. 149, 87 S.Ct. 1507, superseded by statute on another ground as noted in Califano v. Sanders (1977) 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192; Thomas v. Union Carbide Agric. Products Co. (1985) 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409; Security National Guaranty, Inc. v. Cal. Coastal Com'n (2008) 159 Cal.App.4th 402, 418, 71 Cal.Rptr.3d 522; San Diego County Water Authority v. Metropolitan Water Dist. (2004) 117 Cal.App.4th 13, 20, fn. 2, 11 Cal.Rptr.3d 446; Hayward Area Planning Assn. v. Alameda County Transportation Authority (1999) 72 Cal.App.4th 95, 103, 84 Cal.Rptr.2d 744 (Hayward).)
Regarding the second Abbott factor, were we to delay consideration of McKee's constitutional challenges until a future section 6608 petition for release is denied, he would suffer undue hardship in the event his instant challenges are subsequently determined to be meritorious. In that event, McKee would have been wrongfully confined during the significant period required to obtain a favorable final court decision in a future appeal, thereby violating his substantive liberty interest in freedom from unnecessary restraint. (Cf. People v. Allen (2007) 42 Cal.4th 91, 103-104, 64 Cal.Rptr.3d 124, 164 P.3d 557.) Therefore, considering both Abbott factors, we conclude McKee's due process and equal protection contentions are ripe for our review in this appeal. (Pacific Legal, supra, 33 Cal.3d at p. 171, 188 Cal.Rptr. 104, 655 P.2d 306; Abbott, supra, 387 U.S. at p. 149, 87 S.Ct. 1507; Security National Guaranty, Inc., supra, 159 Cal.App.4th at p. 418, 71 Cal.Rptr.3d 522; Caloca v. County of San Diego (2002) 102 Cal. App.4th 433, 442-443, 126 Cal.Rptr.2d 3; Hayward, supra, 72 Cal.App.4th at p. 104, 84 Cal.Rptr.2d 744; Farm Sanctuary, Inc. v. Department of Food & Agriculture (1998) 63 Cal.App.4th 495, 502-503, 74 Cal. Rptr.2d 75.)
In any event, assuming arguendo McKee's due process and equal protection contentions are not technically ripe for review to the extent those contentions rely on the burden of proof and other provisions *672 of section 6608, we nevertheless would exercise our discretion under Pacific Legal to address those contentions in the instant appeal. (Pacific Legal, supra, 33 Cal.3d at p. 170, 188 Cal.Rptr, 104; 655 P.2d 306; Hunt v. Superior Court (1999) 21 Cal.4th 984, 998-999, 90 Cal.Rptr.2d 236, 987 P.2d 705 ["Postponing review ... would leave uncertain the County's health care obligations and undoubtedly result in additional, lengthy appellate proceedings."].) As quoted above, the California Supreme Court stated: "[T]he [ripeness] requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question. [Citations.]" (Pacific Legal, at p. 170, 188 Cal.Rptr. 104, 655 P.2d 306.) In the circumstances of this case, McKee's facial due process and equal protection challenges to the Act, as amended by Proposition 83, involve concrete disputes regarding McKee's indefinite civil commitment as an SVP. Furthermore, were we to defer decision on those constitutional issues, there would be lingering uncertainty in the law regarding the constitutionality of the Act, as it was amended by Proposition 83, an initiative clearly involving widespread public interest. Because Proposition 83 is an initiative passed by California voters and many members of the public presumably have an interest in its continued application, we conclude McKee's constitutional challenges involve widespread public interest in a timely answer to those challenges. Accordingly, our review of those constitutional challenges in this appeal is warranted regardless of any ripeness deficiency. (Pacific Legal, at p. 170, 188 Cal.Rptr. 104, 655 P.2d 306; Hunt, at pp. 998-999, 90 Cal.Rptr.2d 236, 987 P.2d 705; Hayward, supra, 72 Cal.App.4th at p. 104, 84 Cal. Rptr.2d 744.)

C
We now proceed to address McKee's due process constitutional challenge to his indefinite involuntary civil commitment pursuant to the Act, as amended by Proposition 83.
McKee relies primarily on Addington, supra, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 as support for his argument. In Addington, the court addressed the question of whether Texas's civil involuntary commitment statute could constitutionally allow an initial indefinite commitment of a person with proof by a preponderance of the evidence, as the Texas Supreme Court held. (Id. at pp. 419-422, 99 S.Ct. 1804.) Addington stated:
"The state has a legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill. Under the Texas Mental Health Code, however, the State has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others." (Addington, supra, 441 U.S. at p. 426, 99 S.Ct. 1804.)
It cautioned against the possible involuntary commitment of persons who exhibit only idiosyncratic behavior:
"At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is the possible risk that a factfinder might decide *673 to commit an individual based solely on a few isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate commitments will be ordered. [ถ] The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." (Addington, supra, 441 U.S. at pp. 426-427, 99 S.Ct. 1804.)
Accordingly, Addington concluded: "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence." (Addington, supra, 441 U.S. at p. 427, 99 S.Ct. 1804.) Alternatively stated, it concluded: "To meet due process demands, the standard [of proof in a civil commitment proceeding] has to inform the factfinder that the proof must be greater than the preponderance-of-the-evidence standard applicable to other categories of civil cases." (Id. at pp. 432-433.) Addington held that due process required proof by clear and convincing evidence at the appellant's initial civil commitment hearing.[10] (Addington, supra, 441 U.S. at p. 433, 99 S.Ct. 1804.)
McKee argues Addington requires the state to submit proof by clear and convincing evidence at all civil commitment proceedings, including proceedings subsequent to an initial indefinite term commitment that would continue the commitment, and therefore section 6608, subdivision (i), violates due process by imposing on the petitioner the burden to prove by a preponderance of the evidence that he or she is entitled to release. However, the circumstances in Addington involved only an initial civil commitment proceeding and therefore Addington did not address whether findings at proceedings subsequent to an initial civil commitment (e.g., a subsequent review or release hearing) require the state to submit proof by clear and convincing evidence. Furthermore, Addington involved only an "ordinary" civil commitment statute (not unlike a Lanterman-Petris-Short Act civil commitment in California pursuant to ง 5350 et seq.). Addington did not address the standard of proof required in special civil commitment proceedings (e.g., an SVP civil commitment proceeding under the Act). We conclude neither the holding nor the reasoning in Addington requires the application of a clear and convincing standard of proof that the person continues to be an SVP rather than a preponderance of the evidence standard of proof that the person is not an SVP in either a proceeding subsequent to an initial civil commitment proceeding or a proceeding involving a special civil commitment statute.
As the People note, the United States Supreme Court in Jones v. United States (1983) 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (issued after Addington), held that application of a standard of proof *674 by a preponderance of the evidence did not violate the federal constitutional right to due process at an initial hearing regarding the civil commitment of a person previously found not guilty of committing a criminal offense by reason of insanity. At the person's criminal trial in the District of Columbia, a statute required that he prove his affirmative defense of insanity by a preponderance of the evidence. (Jones, at p. 356, fn. 1, 103 S.Ct. 3043.) After his acquittal by reason of insanity, a District of Columbia statute provided for his immediate, indefinite commitment to a mental hospital without a hearing (i.e., automatically). (Id. at pp. 356-357, fn. 2, 360-361, 103 S.Ct. 3043.) However, that statute required a hearing within 50 days of that commitment to determine whether he was eligible for release, "at which [hearing] he ha[d] the burden of proving by a preponderance of the evidence that he [was] no longer mentally ill or dangerous. [Citation.]" (Id. at p. 357, 103 S.Ct. 3043.) If he did not meet that burden at the 50-day hearing, he was "entitled [by statute] to a judicial hearing every six months at which he may establish by a preponderance of the evidence that he is entitled to release. [Citation.]" (Id. at p. 358, 103 S.Ct. 3043, fn. omitted.)
In contrast to the District of Columbia's statutory scheme providing for the civil commitment of a person acquitted on a charged offense because the person proved he or she was not guilty, by reason of insanity (NGI), Jones noted the District of Columbia also had an general civil commitment statutory scheme that provided for the initial commitment of a person "upon clear and convincing proof by the Government that he is mentally ill and likely to injure himself or others. [Citation.]" (Jones, supra, 463 U.S. at pp. 358-359, 103 S.Ct. 3043, fn. omitted.) After the person's initial civil commitment under that general statutory scheme, the committed person was "entitle* after the first 90 days, and subsequently at 6-month intervals, to request a judicial hearing at which he may gain his release by proving by a preponderance of the evidence that he is no longer mentally ill or dangerous. [Citations.]" (Id. at p. 359, 103 S.Ct. 3043.)
In addressing the petitioner's contention that the District of Columbia's NGI civil commitment statutory scheme violated his right to due process, Jones noted: "Congress [as the legislative body of the District of Columbia] has determined that a criminal defendant found not guilty by reason of insanity in the District of Columbia should be committed indefinitely to a mental institution for treatment and the protection of society. [Citations.]" (Jones, supra, 463 U.S. at pp. 361-362, 103 S.Ct. 3043.) Jones then addressed the petitioner's assertion that his NGI civil commitment violated Addington's holding regarding due process because his NGI acquittal of the criminal charge "did not constitute a finding of present mental illness and dangerousness and because it was established only by a preponderance of the evidence."[11] (Jones, supra, at p. 362, 103 S.Ct. 3043, fn. omitted.) Jones first noted that an NGI verdict "established] two facts: (i) the defendant committed an act that constitutes a criminal offense, and (ii) he committed the act because of mental illness." (Id. at p. 363, 103 S.Ct. 3043.) Jones stated: "Congress has determined that these findings constitute an adequate basis for hospitalizing the acquittee as a dangerous and mentally ill person. [Citations.] *675 We cannot say that it was unreasonable and therefore unconstitutional for Congress to make this determination. [ถ] The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness. [Citation.] Indeed, this concrete evidence [of commission of a criminal act] generally may be at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding." (Id. at p. 364, 103 S.Ct. 3043, fns. omitted.)
Jones further stated: "Nor can we say that it was unreasonable for Congress to determine that the insanity acquittal supports an inference of continuing mental illness. It comports with common sense to conclude that someone whose mental illness was sufficient to lead him to commit a criminal act is likely to remain ill and in need of treatment.... Because a hearing is provided within 50 days of the commitment, there is assurance that every acquittee has prompt opportunity to obtain release if he has recovered." (Jones, supra, 463 U.S. at p. 366, 103 S.Ct. 3043.) Jones rejected the petitioner's argument that the government did not have a legitimate reason for automatically committing an NGI acquittee because it could present evidence of that acquittal at a subsequent hearing. (Ibid.) Jones stated: "This argument fails to consider the Government's strong interest in avoiding the need to conduct a de novo commitment hearing following every insanity acquittalโa hearing at which a jury trial may be demanded, [citation], and at which the Government bears the burden of proof by clear and convincing evidence.... We therefore conclude that a finding of not guilty by reason of insanity is a sufficient foundation for commitment of an insanity acquittee for the purposes of treatment and the protection of society." (Ibid.)
More importantly for purposes of the instant case, Jones rejected the petitioner's contention that "his indefinite commitment is unconstitutional because the proof of his insanity was based only on a preponderance of the evidence, as compared to Addington's civil-commitment requirement of proof by clear and convincing evidence." (Jones, supra, 463 U.S. at pp. 366-367, 103 S.Ct. 3043.) Jones explained:
"In equating these situations, petitioner ignores important differences between the class of potential civil-commitment candidates and the class of insanity acquittees that justify differing standards of proof. The Addington Court expressed particular concern that members of the public could be confined on the basis of `some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable.' [Citations.] ... But since automatic commitment under [the District of Columbia's NGI commitment statute] follows only if the acquittee himself advances insanity as a defense and proves that his criminal act was a product of his mental illness, there is good reason for diminished concern as to the risk of error. More important, the proof that he committed a criminal act as a result of mental illness eliminates the risk that he is being committed for mere `idiosyncratic behavior[.]' [Citation.]" (Jones, supra, 463 U.S. at p. 367, 103 S.Ct. 3043, fns. omitted.)
Jones "therefore conclude[d] that concerns critical to our decision in Addington are diminished or absent in the case of insanity acquittees. Accordingly, there is no reason for adopting the same standard of proof in both cases.... The preponderance of the evidence standard comports with due process for commitment of insanity acquittees." (Jones, supra, 463 U.S. at *676 pp. 367-368, 103 S.Ct. 3043.) Accordingly, Jones held: "[W]hen a criminal defendant establishes by a preponderance of the evidence that he is not guilty of a crime by reason of insanity, the Constitution permits the Government, on the basis of the insanity judgment, to confine him to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." (Id. at p. 370, 103 S.Ct. 3043.)
Although, unlike Jones, the instant case does not involve an automatic, indefinite commitment of an insanity acquittee, Jones's reasoning in the circumstances of that case supports a conclusion that an SVP's initial indefinite civil commitment pursuant to the amended Act does not violate the federal constitutional right to due process, even though a subsequent section 6608 petition for release requires the committed person to prove by a preponderance of the evidence that he or she is entitled to release. First, both the District of Columbia statute and the amended Act provide for indefinite civil commitment of persons who are found to be, generally speaking, dangerous to others because of mental illness. Although the District of Columbia statute applies to insanity acquittees and the amended Act applies to sexually violent predators, that distinction is, for purposes of our due process analysis, a distinction without a significant difference.
Jones primarily focused on two prerequisite findings in upholding indefinite civil commitment of insanity acquittees without violation of due process: (1) dangerousness (as shown by the jury's finding beyond a reasonable doubt that the acquittee committed a criminal act); and (2) mental illness (as shown by the jury's finding by a preponderance of the evidence that the acquittee was insane at the time of the act). In our case, similar prerequisite findings were made by the jury at McKee's initial civil commitment trial. In finding McKee was a sexually violent predator within the meaning of the amended Act, the jury necessarily found, by proof beyond a reasonable doubt, that McKee: (1) had been convicted of committing a sexually violent offense against one or more victims; (2) had a diagnosed mental disorder; and (3) as a result of that diagnosed mental disorder, is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior.[12] Therefore, the jury, in effect, found that McKee was both dangerous to others and mentally ill. In fact, unlike in Jones, the finding that McKee had a diagnosed mental disorder *677 (i.e., was mentally ill) was made by proof beyond a reasonable doubt, a standard of proof greater than that required for the insanity defense in Jones (i.e., proof by a preponderance of the evidence).[13] Furthermore, the higher standard of proof required to show McKee's mental illness provided him with, in effect, more due process protection than provided to the insanity acquittee in Jones whose mental illness (i.e., insanity) was proved only by a preponderance of the evidence. Accordingly, McKee's initial civil commitment for an indefinite term satisfied the general due process requirements set forth in Jones.
To the extent McKee argues the District of Columbia statute in Jones provided for a subsequent hearing within 50 days of the insanity acquittee's initial, automatic civil commitment for an indefinite term but the amended Act generally provides him (McKee) with subsequent hearings only pursuant to sections 6605 and 6608 (with or without the DMH's authorization) within one year, we conclude that difference is based on an erroneous comparison of dissimilar proceedings and is therefore irrelevant to our due process analysis in this case. In Jones, the 50-day hearing presumably was intended to be a timely civil hearing on the insanity acquittee's automatic (i.e., without a hearing), indefinite commitment after his insanity acquittal at his criminal trial. In our case, McKee received such a civil hearing at his initial trial pursuant to section 6604 at which both his mental illness and dangerousness were proved by the People beyond a reasonable doubt. Furthermore, at the 50-day civil hearing in Jones to determine whether the insanity acquittee was eligible for release, "he ha[d] the burden of proving by a preponderance of the evidence that he [was] no longer mentally ill or dangerous. [Citation.]" (Jones, supra, 463 U.S., at p. 357, 103 S.Ct. 3043, fn. omitted.) In this case, as noted above, both McKee's dangerousness and mental illness were proved, beyond a reasonable doubt, at his initial section 6604 civil commitment trial, which applied a higher standard of proof than permitted in Jones (i.e., proof by a preponderance of the evidence). Therefore, no 50-day (or other subsequent prompt hearing) was required to review those findings and/or to determine whether McKee should be released. There is no logical reason to conclude McKee's initial section 6604 civil commitment for an indefinite term, subject to subsequent section 6605 annual examinations and potential annual petitions for release pursuant to sections 6005 and 6608, is inadequate to protect McKee's federal constitutional right to due process of law.
Finally, although McKee apparently does not expressly argue he should be entitled to subsequent release hearings every six months as the District of Columbia statute provided in Jones, we see no logical reason to conclude the annual examinations and potential annual petitions for release (whether with or without the DMH's authorization) provided for under sections *678 6605 and 6008 are inadequate to protect his due process right. In fact, in the event the DMH finds, based on a future section 6605 annual examination, that McKee is no longer an SVP or should be conditionally released, section 6605, subdivision (b), provides that the DMH shall "authorize" (or, in effect, support) McKee's petition for release. In such event (after the court finds, probable cause for release), McKee is entitled to, in effect, a de novo trial on his current status as an SVP and whether he should continue to be indefinitely committed. (ง 6605, subds. (c), (d).) At that trial, the People again have the burden to prove, beyond a reasonable doubt, that McKee's "diagnosed mental disorder remains such that he ... is a danger to the health and safety of others and is likely to engage in sexually violent criminal behavior if discharged." '(ง 6605, subd. (d).) That standard of proof (i.e., beyond a reasonable doubt) is greater than the standard of proof allowed by Jones at the six-month hearings under the District of Columbia statute (i.e., by a preponderance of the evidence). Therefore, in the event the DMH finds in the future that McKee is no longer an SVP or should be conditionally released, McKee will receive rights greater than those that arguably were implicitly found constitutionally adequate in Jones for periodic reviews of an indefinite civil commitment. Furthermore, even if the DMH does not find in the future that McKee is no longer an SVP or should be conditionally released (i.e., does not "authorize" McKee;; to file a petition for release), section 66Q8 provides that he may file a petition for release (albeit no more often than one year after denial of a prior petition for release) and is entitled to an evidentiary hearing thereon (if the court first finds, on review of the petition or following a hearing, the petition is not frivolous and, unless it is his first petition, it alleges facts making a prima facie case for a release hearing).[14] (ง 6608, subds. (a), (d),(h).)
Although McKee complains that at such future hearings he would bear the burden to prove his right to release by a preponderance of the evidence (ง 6608, subd. (i)), that burden of proof is the same as the burden of proof placed on the insanity acquittee that arguably was implicitly approved by Jones for six-month review hearings under the District of Columbia statute.[15] Because the review hearings in Jones are analogous to the (potentially) annual petitions for release under section 6608, we conclude the placement on McKee of the burden to prove his right to release by a preponderance of the evidence at hearings on future section 6608 petitions for release (without the DMH's authorization) does not violate his federal constitutional right to due process.
Although McKee argues that standard of proof contradicts the holding in Addington *679 requiring proof by clear and convincing evidence, Addington addressed only the burden of proof required at an initial civil commitment proceeding and therefore Addington did not address whether findings at proceedings subsequent to an initial civil commitment (e.g., a subsequent review or release hearing) require proof by clear and convincing evidence. The circumstances in Addington did not involve any subsequent review or release hearing after an initial civil commitment.[16] Furthermore, Addington also involved only an "ordinary" civil commitment statute (not unlike an "LPS" civil commitment in California pursuant to ง 5350 et seq.). It did not address the burden of proof required in special civil commitment proceedings (e.g., SVP civil commitment proceedings under the Act). Finally, we conclude Jones's approval of the preponderance-of-the-evidence standard essentially overruled Addington's holding to the extent Addington may have applied to subsequent review or release hearings of an indefinite civil commitment.
Although McKee also appears to argue that any indefinite civil commitment (regardless of the standard of proof) violates the federal constitutional right to due process, he does not cite, and we are unaware of, any case so holding. On the contrary, both Addington and Jones involved indefinite civil commitments and neither expressed constitutional concerns regarding the potential length of an indefinite civil commitment. So long as an initial civil commitment for an indefinite term is subject to adequate periodic examinations and petitions for review or release to determine the current status of a committed person to ensure that a committed person who no longer qualifies for commitment is released, we conclude the federal constitutional right to due process does not prohibit an involuntary civil commitment for an indefinite term.[17] (Foucha v. Louisiana, supra, 504 U.S. at p. 77, 112 S.Ct. 1780 [interpreting Jones as holding that an insanity acquittee may be held pursuant to a civil commitment "as long as he is both mentally ill and dangerous, but no longer"]; People v. Allen, supra, 42 Cal.4th at pp. 103-104, 64 Cal.Rptr.3d 124, 164 P.3d 557 [periodic reviews are required for civil commitments of mentally disordered offenders (Pen.Code, ง 2960 et seq.) `"because if the basis for a commitment ceases to exist, continued confinement violates the substantive liberty interest in freedom from unnecessary restraint.' [Citations.]"].) We are not persuaded that McKee's indefinite civil commitment pursuant to the amended Act violated his federal constitutional right to due process of law.

III

Federal Constitutional Ex Post Facto Clause
McKee contends his involuntary commitment as an SVP for an indeterminate term *680 under the Act, as amended by Proposition 83 in 2006, violated the federal constitutional prohibition against ex post facto laws because it is punitive and was applied to his conduct prior to its enactment. Although he concedes the California Supreme Court in Hubbart; supra, 19 Cal.4th 1138, 81 Cal.Rptr.2d 492, 969 P.2d 584 rejected an ex post facto challenge to a two-year involuntary commitment under the pre-Proposition 83 version of the Act, he argues his indeterminate term under the amended Act shows the legislative intent of the Proposition 83 voters was to punish SVP's and therefore the Act violates the prohibition against ex post facto laws.

A
Article I, section 10, of the-United States Constitution provides: "No State shall ... pass any ... ex post facto Law...." The ex post facto clause prohibits only those laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." (Collins v. Youngblood (1990) 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30.)
In Kansas v. Hendricks, supra, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501, the United States Supreme Court rejected an ex post facto challenge to Kansas's SVP statute. (Id. at pp. 362-368, 370-371, 117 S.Ct. 2072.) A state legislature's stated intent regarding the purpose of a civil commitment statute is an important starting point in determining whether that statute is intended to punish SVP's, and courts should ordinarily defer to a legislative statement that the statute is not penal in nature, (Id. at p. 361, 117 S.Ct. 2072.) Nevertheless, an appellant is not precluded from showing that the statute is so punitive either in purpose or effect as to negate the legislature's stated intent. (Ibid.) In attempting to do so, the appellant bears a heavy burden. (Ibid.)
In Hubbart, supra, 19 Cal.4th 1138, 81 Cal.Rptr.2d 492, 969 P.2d 584, the California Supreme Court rejected an ex post facto challenge to the pre-Proposition 83 version of the Act. (Id. at pp. 1170-1179, 81 Cal.Rptr.2d 492, 969 P.2d 584.) In so doing, the court noted that the Legislature, in originally enacting the Act, "disavowed any `punitive purpose[ ],' and declared its intent to establish `civil commitment' proceedings in order to provide 'treatment' to mentally disordered individuals who cannot control sexually violent criminal behavior. [Citations.] The Legislature also made clear that, despite their criminal record, persons eligible for commitment and treatment as SVP's are to be viewed `not as criminals, but as sick persons.' [Citation.] Consistent with these remarks, the [Act] was placed in the Welfare and Institutions Code, surrounded on each side by other schemes concerned with the care and treatment of various mentally ill and disabled groups. [Citation.]" (Id. at p. 1171, 81 Cal.Rptr.2d 492, 969 P.2d 584.) "Viewing the legislative record as a whole," the court reached a similar conclusion as the United States Supreme Court did in Hendricks (i.e., that the Legislature intended a nonpenal civil commitment scheme). (Hubbart, at p. 1172, 81 Cal.Rptr.2d 492, 969 P.2d 584.)
Hubbart also followed Hendricks for guidance in determining whether the appellant had met his heavy burden to show the Act was so punitive either in purpose or effect to negate the Legislature's stated nonpunitive intent. (Hubbart, supra, 19 Cal.4th at p. 1172, 81 Cal.Rptr.2d 492, 969 P.2d 584.) In Hendricks, the court concluded that neither reliance on the appellant's prior criminal conduct, nor his compulsory confinement, made the Kansas scheme punitive. (Hendricks, supra, 521 U.S. at pp. 362-363, 117 S.Ct. 2072.) Hendricks concluded that the restriction of the *681 freedom of the dangerously mentally ill was "a legitimate nonpunitive governmental objective and has been historically so regarded." (Id. at p. 363, 117 S.Ct. 2072.) Therefore, Kansas's SVP act had neither a retribution nor a deterrence purpose or effect. (Id. at pp. 362-363,117 S.Ct. 2072.) Importantly for purposes of the instant case, Hubbart noted that Hendricks "also found that [the appellant's] concern over the possibility of indefinite commitment was misplaced." (Hubbart, at p. 1173, 81 Cal.Rptr.2d 492, 969 P.2d 584.) Hendricks stated:
"Far from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others. [Citation.] If, at any time, the confined person is adjudged `safe to be at large,' he is statutorily entitled to immediate release. [Citation.]"[18] (Hendricks, supra, 521 U.S. at pp. 363-364, 117 S.Ct. 2072, italics added.)
Hendricks also concluded that the commitment under the Kansas SVP act was not "disguised punishment" because treatment was at least an ancillary goal (in addition to confinement for protection of the public). (Id. at pp. 365-368, 117 S.Ct. 2072.)
Applying Hendricks's reasoning to the pre-Proposition 83 version of the Act, Hubbart concluded the Act could not be "meaningfully distinguished for ex post facto purposes from the Kansas scheme considered in Hendricks. Both laws base the commitment determination, in part, on the commission of sexually violent predatory crimes." (Hubbart, supra, 19 Cal.4th at p. 1175, 81 Cal.Rptr.2d 492, 969 P.2d 584.) Furthermore, as in Hendricks, the Act does not affix culpability or seek retribution for criminal conduct. (Hubbart, at p. 1175, 81 Cal.Rptr.2d 492, 969 P.2d 584.) Accordingly, Hubbart concluded: "[T]he [Act] does not impose liability or punishment for criminal conduct, and does not implicate ex post facto concerns insofar as pre-Act crimes are used as evidence in the SVP determination." (Ibid.) Hubbart also rejected the claim that commitment under the Act was equivalent to a prison sentence. (Id. at p. 1176, 81 Cal.Rptr.2d 492, 969 P.2d 584.) It rejected the assertion that the Act's provisions for conditional release under section 6608 (including placement of the burden of proof by a preponderance of the evidence on the petitioner) allowed confinement that likely would last longer than allowed under Hendricks. (Hubbart, at pp. 1176-1177, 81 Cal.Rptr.2d 492, 969 P.2d 584.)
Hubbart noted that "the critical factor is whether the duration of confinement is 'linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others.' [Citation.]" (Hubbart, supra, 19 Cal.4th at p. 1176, 81 Cal.Rptr.2d 492, 969 P.2d 584.) Hubbart concluded: "Viewed as a whole, the [Act] is also designed to ensure that the committed person does not `remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness.' [Citation.]" (Id. at p. 1177, 81 Cal.Rptr.2d 492, 969 P.2d 584.) In addition to the (pre-Proposition 83) Act's strict (two-year) limitation on each period of confinement, Hubbart also noted the provisions of sections 6605 and 6608 provided procedures for conditional and *682 unconditional release during a period of confinement. (Hubbart, at p. 1177, 81 Cal. Rptr.2d 492, 969 P.2d 584.) Hubbart concluded: "In light of [those] provisions, [the appellant] has not established that the [Act] imposes `punishment' by continuing the confinement of persons who are no longer dangerously disturbed." (Id. at p. 1177, 81 Cal.Rptr.2d 492, 969 P.2d 584, fn. omitted.) Therefore, Hubbart held: "[The appellant] has not demonstrated that the [Act] imposes punishment or otherwise implicates ex post facto concerns. We therefore decline to invalidate the statutory scheme insofar as it permits use in the civil commitment determination of sexually violent offenses committed before the effective date of the Act." (Id, at p. 1179, 81 Cal.Rptr.2d 492, 969 P.2d 584.)

B
Although McKee acknowledges Hubbart rejected the ex post facto challenge to the pre-Proposition 83 version of the Act, he nevertheless argues that Proposition 83 evinced a punitive purpose and its amendment of the Act makes it punitive in purpose and effect and therefore violates the federal constitutional prohibition against ex post facto laws. In particular, he argues the Office of the Legislative Analyst prepared an analysis describing the comprehensive package of reforms included in Proposition 83, which analysis referred to amendments to the Penal Code increasing the punishment for sex offenses. However, McKee does not expressly quote or cite to any particular provisions of either that analysis or Proposition 83. In any event, any Penal Code amendments made by Proposition 83 that increased the punishment for various sex offenses have little, if any, relevance to the purpose or effect of Proposition 83's amendments to the Welfare and Institutions Code regarding civil commitments of SVP's (e.g., amendments of งง 6604 and 6605). Although both provisions were included within the comprehensive Proposition 83 package of reforms, the express punitive purpose of amendments to Penal Code criminal offenses does not show the voters had the same purpose in amending the civil commitment provisions of the Act. We are not persuaded that "[t]he voters would understand Proposition 83 as a punitive measure designed to increase the period of time sex offenders are held in custody," to the extent Proposition 83 amended the Act's civil commitment provisions for SVP's.
McKee alternatively argues that, applying a seven-factor test to Proposition 83's amendments to the Act, the effect of those amendments is punitive. Without discussing each of the seven factors set forth in Kennedy v. Mendoza-Martinez (1963) 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644, we are not persuaded the application of that test shows the purpose and effect of those amendments to the Act were punitive and prevail over their stated nonpunitive legislative intent.[19] Although the Act, as amended, provides for an indeterminate term of civil commitment (ง 6604), that term is not comparable to an indeterminate prison term, which has historically been considered punitive. On the contrary, Hendricks concluded the restriction of the freedom of the dangerously mentally ill was "a legitimate nonpunitive governmental objective and has been historically so regarded." (Hendricks, supra, 521 U.S. at p. 363,117 S.Ct. 2072.) Regarding Kansas's SVP act, it stated: "Far from any punitive objective, the confinement's duration is instead linked to the stated purposes *683 of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others." (Hendricks, at p. 363, 117 S.Ct. 2072.)
Therefore, although the amended Act provides for an indeterminate term, that term's duration is linked not to punishment, but to its stated purpose of treating the committed person and protecting the public from these persons who currently are SVP's. Because there are procedures for release of a committed person who no longer is an SVP (e.g., งง 6605, 6608), the indeterminate term provided by section 6604 does not show the amended Act is now punitive. Accordingly, Proposition 83's amendments to the Act do not require a different conclusion than reached by the California Supreme Court in Hubbart. (Hubbart, supra, 19 Cal.4th at pp. 1176-1177, 81 Cal.Rptr.2d 492, 969 P.2d 584.) Furthermore, the amendments to the Act do not show its purpose or effect is retribution or deterrence. (Hendricks, supra, 521 U.S. at pp. 362-363, 117 S.Ct. 2072; Hubbart, at p. 1175, 81 Cal.Rptr.2d 492, 969 P.2d 584.) Also, the Act's reliance on a person's past criminal convictions does not show the Act has a punitive purpose or effect. (Cf. Hubbart, at p. 1175, 81 Cal. Rptr.2d 492, 969 P.2d 584["[T]he [Act] ... does not implicate ex post facto concerns insofar as pre-Act crimes are used as evidence in the SVP determination."].) Finally, none of the other Proposition 83 amendments to the Act show the Act's purpose or effect is punitive.[20] Therefore, like the court in Hubbart, we conclude: "[The appellant] has not demonstrated that the [Act] imposes punishment or otherwise implicates ex post facto concerns." (Hubbart, supra, 19 Cal.4th at p. 1179, 81 Cal.Rptr.2d 492, 969 P.2d 584.)

IV

Federal Constitutional Right to Equal Protection under the Law
McKee contends his involuntary commitment as an SVP under the Act, as amended by Proposition 83 in 2006, violated his federal constitutional right to equal protection under the law.

A
"The right to equal protection of the laws is guaranteed by the Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution. The `first prerequisite' to an equal protection claim is `"a showing that `the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.'" ...' [Citation.] [ถ] `Equal protection applies to ensure that persons similarly situated with respect to the legitimate purpose of the law receive like treatment; equal protection does not require identical treatment. [Citation.]' [Citation.] The state `may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified. [Citations.] Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of power.' [Citation.]" (People v. Hubbart (2001) 88 Cal.App.4th 1202, 1216-1217, 106 Cal. Rptr.2d 490.)
*684 "Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment. [Citations.]" (People v. Green (2000) 79 Cal.App.4th 921, 924, 94 Cal. Rptr.2d 355.) Applying the strict scrutiny standard, the state has the burden of establishing it has a compelling interest that justifies the law and the distinctions, or disparate treatment, made by that law are necessary to further its purpose. (Warden v. State Bar (1999) 21 Cal.4th 628, 641, 88 Cal.Rptr.2d 283, 982 P.2d 154.) Alternatively stated, applying the strict scrutiny standard, a law "is upheld only if it is necessary to further a compelling state interest. [Citation.]" (People v. Buffington (1999) 74 Cal.App.4th 1149, 1156, 88 Cal.Rptr.2d 696.)

B
McKee asserts the amended Act violates his federal constitutional right to equal protection of the law because SVP's under the Act are similarly situated to mentally disordered offenders (MDO's), who are civilly committed pursuant to Penal Code section 2960 et seq., and to persons found not guilty by reason of insanity (NGI's), who are civilly committed pursuant to Penal Code section 1026 et seq. He argues SVP's are, however, disparately treated from MDO's and NGI's, and that disparate treatment is not necessary to further any compelling state interest.[21]
McKee argues SVP's and MDO's are similarly situated apparently because both are "committed for treatment because they represent a danger to the public because of a mental disorder." However, we are not persuaded that SVP's and MDO's are similarly situated and the Legislature has adopted a classification that affects them in an unequal manner. (People v. Hubbart, supra, 88 Cal.App.4th at p. 1216, 106 Cal.Rptr.2d 490.) The classifications of an SVP and an MDO are different. An SVP is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (ง 6600, subd. (a)(1).) In contrast, an MDO is generally defined as a person with a severe mental disorder that cannot be kept in remission without treatment and that was a cause or factor in the commission of a felony offense and, because of that severe mental disorder, represents a substantial danger of physical harm to others. (Pen.Code, ง 2962, subds.(a)-(e); People v. Allen, supra, 42 Cal.4th at p. 99, 64 Cal.Rptr.3d 124, 164 P.3d 557.) Therefore, the dangers posed by an SVP and an, MDO are different. An SVP is civilly committed for treatment and confinement, in part, because of the danger posed that he or she will likely engage in sexually violent criminal behavior in the future. An MDO is civilly committed for treatment and confinement, in part, because of a substantial danger he or she will physically harm others in the future. Although both SVP's and MDO's have mental disorders, the dangers they pose (which provide the bases for their respective civil commitments) are different and therefore they are not similarly situated.
Assuming arguendo that SVP's and MDO's are similarly situated, we nevertheless conclude their disparate treatment is necessary to further a compelling state interest. McKee notes that SVP's under the amended Act are given indeterminate commitments and thereafter have the burden to prove they should be released (unless the DMH authorizes a petition for *685 release). In contrast, McKee notes that MDO's are committed for one-year periods and thereafter have the right to annual reviews of their confinement at which the People have the burden to prove beyond a reasonable doubt that he or she should be recommitted for another year. (See Pen. Code, งง 2970, 2972, subds. (a), (b), (e); People v. Allen, supra, 42 Cal.4th at pp. 99-100, 64 Cal.Rptr.3d 124, 164 P.3d 557.) McKee argues; "There is no compelling state interest that is advanced by granting MDO defendants the right to judicial review every year of their custodial status but making [SVP] defendants subject to potentially a life term with no meaningful judicial review of their commitment."
First, an SVP's indeterminate term of civil commitment is subject to meaningful judicial review. Sections 6605 and 6608 provide an SVP with an opportunity for annual judicial review (provided his or her petition for release is not frivolous and is supported by sufficient factual allegations). Second, there is a compelling state interest in committing an SVP to an indeterminate term. The People argue SVP's are treated differently (i.e., given an indeterminate term of civil commitment) because they are less likely to be cured, more likely to reoffend, and therefore more dangerous. As the California Supreme Court noted, the Act, on its original enactment, "narrowly target[ed] `a small but extremely dangerous group' of sexually violent predators that have diagnosable mental disorders [who] can be identified while they are incarcerated." (Cooley v. Superior Court, supra, 29 Cal.4th at p. 253, 127 Cal. Rptr.2d 177, 57 P.3d 654.)
Thereafter, on passage of Proposition 83, the voters' information pamphlet for Proposition 83 noted: "Sex offenders have very high recidivism rates. According to a 1998 report by the U.S. Department of Justice, sex offenders are the least likely to be cured and the most likely to reoffend, and they prey on the most innocent members of our society. More than two/thirds of the victims of rape and sexual assault are under the age of 18. Sex offenders have a dramatically higher recidivism rate for their crimes than any other type of violent felon." (Historical and Statutory Notes, 47A West's Ann. Pen. Code (2008 supp.) foil. ง 209, p. 462; see Ballot Pamp., Gen. Elec. (Nov. 7, 2006) text of Prop. 83, p. 127.)
Also, as we noted in People v. Shields, supra, 155 Cal.App.4th 559, 65 Cal.Rptr.3d 922, the voters in passing Proposition 83 in 2006 intended to enhance the confinement of SVP's. (Shields, at p. 563, 65 Cal. Rptr.3d 922.) In Shields, we stated: "Proposition 83 states that the change from a two-year term to an indeterminate term is designed to eliminate automatic SVP trials every two years when there is nothing to suggest a change in the person's SVP condition to warrant release...." (Shields, at p. 564, 65 Cal. Rptr.3d 922.) The change to an indeterminate term also was intended to reduce the costs of SVP evaluations and court testimony. (Bourquez v. Superior Court, supra, 156 Cal.App.4th at p. 1287, 68 Cal. Rptr.3d 142.) Regarding the pre-Proposition 83 version of the Act, the California Supreme Court stated: "The problem targeted by the Act is acute, and the state interestsโprotection of the public and mental health treatmentโare compelling." (Hubbart, supra, 19 Cal.4th at p. 1153, fn. 20, 81 Cal.Rptr.2d 492, 969 P.2d 584, italics added.) Based on the evidence of the voters' intent in passing Proposition 83, we conclude that the changes made to the Act by Proposition 83, including changing the civil commitment from two years to an indeterminate term, were necessary to further compelling state interests. Therefore, the disparate treatment between SVP's under the amended Act and MDO's does not violate McKee's federal constitutional *686 right to equal protection under the law.

C
McKee also summarily argues SVP's and NGFs are similarly situated. However, because McKee's opening brief contains no analysis showing how those two groups are similarly situated under the law, he has not carried his burden on appeal to persuade us that SVP's and NGFs are similarly situated to the extent the Legislature has adopted a classification that affects them in an unequal manner. (People v. Hubbart, supra, 88 Cal.App.4th at p. 1216,106 Cal.Rptr.2d 490.)
In any event, assuming arguendo SVP's and NGFs are similarly situated, we nevertheless reject his argument that the People have not shown their disparate treatment is necessary to further any compelling state interest. McKee notes that SVP's under the amended Act "do not have any right to compel a hearing on the merits regarding their committed status, and that deprivation continues indefinitely." In contrast, McKee notes that NGI's have the right to file a petition for release within 180 days after their initial commitments, which petition may not be summarily denied without a hearing. (See Pen.Code, ง 1026.2, subds. (a), (d); People v. Soiu (2003) 106 Cal.App.4th 1191, 1197, 131 Cal. Rptr.2d 421.) However, we disagree with McKee's assertion that NGI's are treated more favorably than SVP's at the first evidentiary hearings on their respective commitments. First, we reject McKee's assertion that SVP's do not have any right to a hearing on the merits of their commitment. Even without the DMH's authorization under section 6605, an SVP is annually entitled to an evidentiary hearing on a petition for release if he or she can allege sufficient facts for a release hearing. (ง 6608, subds.(a), (d).) A section 6608 petition for release of an SVP may be rejected without an evidentiary hearing only if that petition is frivolous or fails to allege sufficient facts for a hearing. (ง 6608, subd. (a).)
Second, McKee does not show NGI's are treated more favorably than SVP's. McKee omits reference to the process by which NGI's are initially committed. California essentially follows an automatic civil commitment process for NGI's not unlike that described in Jones, supra, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694, discussed above. Penal Code section 1026 provides: "If the verdict or finding be that the defendant was insane at the time the offense was committed, the court, unless it shall appear to the court that the sanity of the defendant has been recovered fully, shall direct that the defendant be confined in a state hospital for the care and treatment of the mentally disordered or any other appropriate public or private treatment facility approved by the community program director...." Therefore, an NGI's initial civil commitment is automatic (i.e., without any evidentiary hearing regarding his or her continuing mental illness and dangerousness). It is not until 180 days after that automatic initial commitment that an NGI is entitled to an evidentiary hearing on those issues on the NGI's filing of an application for release. (Pen.Code, ง 1026.2, subds. (a), (d).) Furthermore, at that evidentiary hearing subsequent to the NGI's initial commitment, the NGI bears the burden to prove he or she is entitled to release by a preponderance of the evidence. (Pen.Code, ง 1026.2, subd. (k).)
Accordingly, the 180-day evidentiary hearing for NGI's treats NGI's less favorably than SVP's under the amended Act. SVP's initial civil commitments under the amended Act are not automatic. Rather, a person can be initially committed as an SVP only after an evidentiary hearing before a jury or court at which the People bear the burden to prove beyond a reasonable doubt that the person is an SVP *687 under the amended Act. (ง 6604.) Accordingly, the 180-day evidentiary hearing given an NGI following his or her automatic initial commitment cannot be considered more favorable treatment than that given an SVP. We conclude there is no disparate treatment between SVP's and NGI's that violates McKee's (as an SVP) federal constitutional right to equal protection of the law.[22]

V

Sufficiency of the Evidence
McKee contends the evidence is insufficient to support the jury's finding at his civil commitment trial that he is an SVP under the amended Act.

A
Section 6600, subdivision (a)(1), provides: "`Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." After the evidentiary phase of McKee's trial, the trial court instructed with a modified version of CALCRIM No. 3454:
"The petition alleges that Richard McKee is a sexually violent predator. [ถ] To prove this allegation, the People must prove beyond a reasonable doubt that: [ถ] 1. He has been convicted of committing sexually violent offenses against one or more victims; [ถ] 2. He has a diagnosed mental disorder; [ถ] AND [ถ] 3. As a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior; [ถ] The term diagnosed mental disorder includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others. [ถ] A person is likely to engage in sexually violent predatory criminal behavior if there is a substantial, serious, and well-founded risk that the person will engage in such conduct if released into the community. [ถ] The likelihood that the person will engage in such conduct does not have to be greater than 50 percent. [ถ] Sexually violent criminal behavior is predatory if it is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or a person with whom a relationship has been established or promoted for the primary person of victimization."
The jury found that McKee was an SVP within the meaning of the amended Act.
In reviewing the sufficiency of the evidence to support a person's civil commitment as an SVP pursuant to the Act, we apply the substantial evidence standard of review. (People v. Mercer (1999) 70 Cal.App.4th 463, 465-466, 82 Cal. Rptr.2d 723.) "Under this standard, the court `must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidenceโthat is, evidence which is reasonable, credible, and of solid valueโ such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations. ] The focus of the *688 substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on the `"isolated bits of evidence."' [Citation.]" (People v. Cuevas (1995) 12 Cal.4th 252, 260-261, 48 Cal. Rptr.2d 135, 906 P.2d 1290, italics added in Cuevas.) We "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (People v. Jones (1990) 51 Cal.3d 294, 314, 270 Cal.Rptr. 611, 792 P.2d 643.) "We must therefore review the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor...." (Jessup Farms v. Baldwin (1983) 33 Cal.3d 639, 660, 190 Cal.Rptr. 355, 660 P.2d 813.)
Furthermore, "[although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" (People v. Jones, supra, 51 Cal.3d at p. 314, 270 Cal.Rptr. 611, 792 P.2d 643.) In particular, "[t]he credibility of the experts and their conclusions [are] matters [to be] resolved ... by the jury" and "[w]e are not free to reweigh or reinterpret [that] evidence. [Citations.]" (People v. Mercer, supra, 70 Cal.App.4th at pp. 466-67, 82 Cal.Rptr.2d 723.) "The testimony of one witness [e.g., an expert witness], if believed, may be sufficient to prove any fact. (Evid.Code, ง 411.)" (People v. Rasmuson (2006) 145 Cal. App.4th 1487, 1508, 52 Cal.Rptr.3d 598.)

B
At trial, psychologist Richard Romanoff testified that he evaluated McKee on two occasions (in August 2004 and in January 2007) and determined on both occasions that McKee was an SVP. Romanoff testified that McKee suffered from pedophilia and had a schizoaffective disorder. Although McKee received mental health treatment and medication while in prison through 2004, he then stopped taking his medication. He then became hostile, denied having a mental illness, and denied having inappropriate prior sexual contact with children. Based on his evaluations, a review of McKee's prior history, and the results of a standard risk-assessment test (i.e., STATIC-99), Romanoff believed McKee's mental disorders made it difficult for him to control his sexual behavior and he was likely to engage in sexually criminal behavior in the future.[23]
Psychologist Jack Vognsen testified he had evaluated McKee in October 2004 and attempted to evaluate him in 2006 and 2007, but McKee was uncooperative. Vognsen testified that McKee suffered from pedophilia and had a schizoaffective disorder. McKee's mental condition deteriorated after he discontinued his medication in 2004. Vognsen believed McKee had difficulty controlling his behavior and was likely to reoffend and therefore met the criteria of an SVP.[24]
*689 In McKee's defense, psychologist Nancy Rueschenberg testified that although he suffered from pedophilia and had a schizoaffective disorder, she believed McKee had a low risk of reoffending and therefore did not meet the criteria for an SVP.[25]
McKee testified in his defense that he faked having a mental illness to survive in prison. He denied having prior inappropriate sexual contact with his niece and claimed his wife fabricated that story. He admitted having prior sexual contact with his babysitter (who was then 11 years old), but denied knowing her age at the time.

C
In challenging the sufficiency of the evidence to support the jury's finding that he is an SVP, McKee argues the evidence is insufficient to support the "likelihood" element of the definition of an SVP (i.e., as a result of his diagnosed mental disorders, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior). In so doing, McKee acknowledges that two experts (Romanoff and Vognsen) testified that he was likely to reoffend and met the criteria of an SVP, but he nevertheless argues their expert testimony was insufficient to support the jury's finding because his expert (Rueschenberg) contradicted their conclusions (i.e., she testified McKee was not likely to reoffend and therefore did not meet the criteria of an SVP).
Although McKee argues the testing and evaluations conducted by Romanoff and Vognsen were unreliable indicators of the likelihood of reoffense, we must construe the evidence most favorably to support the verdict. McKee does not cite any evidence admitted at trial that shows the testing and evaluations conducted by Romanoff and Vognsen were inherently unreliable. Rather, he essentially argues his expert's (i.e., Rueschenberg's) opinion was more credible and should have been accepted by the jury instead of the contrary opinions of the People's experts (i.e., Romanoff and Vognsen). In particular, he argues his expert's calculation of his reoffense test score (i.e., STATIC-99) of two was more accurate than the other two expert's scores of three because those two experts admitted it was possible he had only two (and not three, as they understood his record) charged offenses and one conviction in 1991. However, the jury was charged with weighing the credibility of the experts' testimony and implicitly found the credibility of the testimonies of Romanoff and Vognsen more persuasive than the testimony of Rueschenberg. It is not our function on appeal to reweigh the evidence or the credibility of witnesses. (People v. Mercer, supra, 70 Cal.App.4th at pp. 466-467, 82 Cal.Rptr.2d 723.)
Furthermore, Romanoff testified that he believed McKee fell within the 30 percent group of people that the STATIC-99 testing did not properly diagnose because of the high level of deviancy demonstrated by his (McKee's) history. Therefore, Romanoff necessarily concluded McKee was likely to reoffend and was an SVP even though he may have had only two charged offenses and one conviction in 1991 that could have resulted in a lower STATIC-99 score of two. Accordingly, considering the evidence favorably to support the verdict, we conclude there is substantial evidence *690 to support the jury's finding that as a result of his diagnosed mental disorders, McKee is a danger to the health and safety of others because it is likely he will engage in sexually violent predatory criminal behavior.

VI

Refused Jury Instruction
McKee contends the trial court erred by refusing his proposed modification to the jury instruction (i.e., CAL-CRIM No. 3454) given by the trial court defining an SVP and describing the People's burden of proof. McKee requested the trial court add the following language to its instruction: "`The diagnosed mental disorder must render the person unable to control ... his dangerous behavior.'" Citing People v. Williams, supra, 31 Cal.4th 757, 3 Cal.Rptr.3d 684, 74 P.3d 779, the trial court denied that proposed modification.
McKee acknowledges that Williams held his proposed language is not required in properly instructing a jury on the definition of an SVP, but he nevertheless raises this contention to preserve the purported error for purposes of federal court review. Williams concluded that because the Legislature's definition of an SVP should prevail, an instruction incorporating the language of the Act's definition of an SVP, but without additional impairment-of-control instructions, is constitutionally adequate. (People v. Williams, supra, 31 Cal.4th at pp. 774-777, 3 Cal.Rptr.3d 684, 74 P.3d 779.) Williams stated that a jury properly instructed on the requirement of dangerousness because of a diagnosed mental disorder "necessarily understand] that one is not eligible for commitment under the [Act] unless his or her capacity or ability to control violent criminal sexual behavior is seriously and dangerously impaired. No additional instructions or findings are necessary." (Williams, at pp. 776-777, 3 Cal.Rptr.3d 684, 74 P.3d 779, fn. omitted.) Because-we are bound to follow this binding precedent of the California Supreme Court, we reject McKee's contention that the trial court erred by refusing his proposed modification to the court's instruction defining the elements of an SVP. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal. Rptr. 321, 369 P.2d 937.)

DISPOSITION
The order is affirmed.
WE CONCUR: HUFFMAN, Acting P.J., and AARON, J.
NOTES
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] At trial, the evidence showed McKee had been convicted in 1991 for committing lewd acts against an 11-year-old babysitter and in 1998 for committing lewd acts against his eight-year-old niece.
[3] Former 6604 provided in pertinent part:

"[T]he person shall not be kept in actual custody longer than two years unless a subsequent extended commitment is obtained from the court incident to the filing of a new petition for commitment under this article or unless the term of commitment changes pursuant to subdivision (e) of Section 6605."
[4] "Proposition 83 states that the change from a two-year term to an indeterminate term is designed to eliminate automatic SVP trials every two years when there is nothing to suggest a change in the person's SVP condition to warrant release: `"The People find and declare each of the following: [ถ] ... [ถ] (k) California is the only state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments. California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator. As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person."' [Citations.]" (People v. Shields, supra, 155 Cal.App.4th at p. 564, 65 Cal.Rptr.3d 922.)
[5] Proposition 83 changed the definition of an SVP by lowering the number of victims in the qualifying sexually violent offense(s) from two to one under section 6600, subdivision (a)(1), which now provides: "`Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Italics added.)
[6] Section 6608, subdivision (d), provides: "The court shall hold a hearing to determine whether the person committed would be a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under supervision and treatment in the community. If the court at the hearing determines that the committed person would not be a danger to others due to his or her diagnosed mental disorder while under supervision and treatment in the community, the court shall order the committed person placed with an appropriate forensic conditional release program operated by the state for one year. A substantial portion of the state-operated forensic conditional release program shall include outpatient supervision and treatment. The court shall retain jurisdiction of the person throughout the course of the program. At the end of one year, the court shall hold a hearing to determine if the person should be unconditionally released from commitment on the basis that, by reason of a diagnosed mental disorder, he or she is not a danger to the health and safety of others in that it is not likely that he or she will engage in sexually violent criminal behavior. The court shall not make this determination until the person has completed at least one year in the state-operated forensic conditional release program. The court shall notify the [DMH] of the hearing date."
[7] "Section 6605, on the other hand, permits unconditional release without prior placement in a conditional release program." (People v. Cheek, supra, 25 Cal.4th at p. 902, 108 Cal.Rptr.2d 181, 24 P.3d 1204.)
[8] McKee apparently misinterprets section 6608, subdivision (i), and Proposition 83, asserting in his opening brief: "The [Act] was also modified [by Proposition 83] to place the burden on the SVP ... to prove that he [is] not fit for commitment pursuant to the [Act]." Proposition 83 did not amend section 6608. subdivision (i), which places the burden on the committed person to prove by a preponderance of the evidence that he or she is entitled to conditional release for one year and subsequent unconditional discharge after that one-year conditional release.
[9] The United States Supreme Court has recognized that ripeness requirements for federal court review do not necessarily apply to review by state courts. (ASARCO Inc. v. Kadish (1989) 490 U.S. 605, 617, 109 S.Ct. 2037, 104 L.Ed.2d 696.)
[10] In so holding, the court rejected the appellant's argument that due process required proof beyond a reasonable doubt, stating: "We have concluded that the reasonable-doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment." (Addington, supra, 441 U.S. at p. 432, 99 S.Ct. 1804.)
[11] The appellant also asserted his NGI civil commitment could continue only as long as the prison term he would have served had he been convicted of the charged criminal offense, and thereafter he should either be released or recommitted under the general civil commitment statute. (Jones, supra, 463 U.S. at p. 363, 103 S.Ct. 3043.)
[12] The jury was instructed with a modified version of CALCRIM No. 3454, as follows: "The petition alleges that Richard McKee is a sexually violent predator. [ถ] To prove this allegation, the People must prove beyond a reasonable doubt that: [ถ] 1. He has been convicted of committing sexually violent offenses against one or more victims; [ถ] 2. He has a diagnosed mental disorder; [ถ] AND [ถ] 3. As a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior; [ถ] The term diagnosed mental disorder includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others. [H] A person is likely to engage in sexually violent predatory criminal behavior if there is a substantial, serious, and well-founded risk that the person will engage in such conduct if released into the community. [ถ] The likelihood that the person will engage in such conduct does not have to be greater than 50 percent. [ถ] Sexually violent criminal behavior' is predatory if it is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or a person with whom a relationship has been established or promoted for the primary person of victimization."
[13] The fact that the acquittee in Jones affirmatively raised the defense of insanity and in this case the People alleged McKee's diagnosed mental disorder provides no logical basis on which to conclude the finding of mental illness in Jones satisfied due process but the jury's finding of McKee's diagnosed mental disorder in this case did not. It is our understanding that it is the finding of mental illness (in addition to a finding of dangerousness) that is essential to satisfy due process, and not which party asserts that mental illness (e.g., the People or the committed person). In any event, the fact that McKee's mental illness was proved beyond a reasonable doubt (in contrast to proof by a preponderance of the evidence as in Jones) ameliorates any concern that the People, and not McKee, raised that question.
[14] The amended Act does grant McKee a right to subsequent hearings on the merits of his indefinite civil commitment. The fact that right may be limited in the event a future petition for release is frivolous or he cannot allege sufficient facts to make a prima facie case for a hearing does not constitute an unconstitutional civil commitment in perpetuity in the event he no longer is an SVP. Rather, the amended Act reasonably precludes a full evidentiary hearing of a petition for release when that petition and its supporting evidence are insufficient to warrant the expenditure of substantial judicial resources.
[15] Although McKee also complains that section 6608 does not expressly provide him with the right to assistance of an expert at a hearing on a section 6608 petition for release, that right presumably can be inferred from his section 6605 right to have his own expert conduct an annual examination. (ง 6605, subd. (a) ["The person may retain, or if he or she is indigent and so requests, the court may appoint, a qualified expert or professional person to examine him or her, and the expert or professional person shall have access to all records concerning the person."].)
[16] A section 6608 petition for release filed after a section 6604 initial civil commitment for an indeterminate term is not, as McKee asserts, "more akin to an initial civil commitment proceeding than a hearing to determine if the commitment should be extended."
[17] To the extent McKee relies on Kansas v. Hendricks, supra, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 as support for his due process contention, that case is inapposite because it addressed only the ex post facto issue, as discussed below. Hendricks does not show that McKee's involuntary civil commitment as an SVP for an indeterminate term pursuant to the amended Act violated his federal constitutional right to due process. Although McKee also cites Foucha v. Louisiana (1992) 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 and O'Connor v. Donaldson, supra, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 as support for his due process contention, neither case persuades us that his federal constitutional right to due process was violated.
[18] However, unlike the post-Proposition 83 version of the Act, the Kansas SVP act required an evidentiary hearing to continue a person's confinement, at which hearing the trial court would have to find beyond a reasonable doubt that the person currently met the same standards required for the person's initial confinement. (Hendricks, supra, 521 U.S. at pp. 363-364, 117 S.Ct. 2072.)
[19] Although the seven factors set forth in Kennedy are useful guideposts, they are not dispositive of the question whether a statute violates the prohibition against ex post facto laws. (Smith v. Doe (2003) 538 U.S. 84, 97, 123 S.Ct. 1140, 155 L.Ed.2d 164.)
[20] Neither the change in section 6600, subdivision (a)'s definition of an SVP (i.e., a person convicted of a sexually violent offense against one, rather than two, victims), nor the change in 6600, subdivision (b)'s definition of a sexually violent offense to include additional offenses, show the amended Act's purpose or effect is punitive and requires a different conclusion.
[21] As we concluded in part II.B., ante, McKee's facial equal protection challenge to the Act, as amended by Proposition 83, is ripe for review.
[22] In any event, assuming arguendo SVP's and NGI's are similarly situated and receive disparate treatment, we nevertheless would conclude, as we discussed in part IV.B., ante, the disparate treatment is necessary to further compelling state interests and therefore does not violate McKee's federal constitutional right to equal protection under the law.
[23] Romanoff's testing showed McKee had a STATIC-99 score of three, making him a moderate to low risk of reoffending. However, even had that test score been only two, Romanoff believed McKee was one of the 30 percent of persons for whom the STATIC-99 test did not diagnose properly. Therefore, Romanoff nevertheless believed McKee was an SVP.
[24] Like Romanoff, Vognsen used the STATIC-99 test and calculated a score of three for McKee's likelihood of reoffense. Vognsen also used an older version of STATIC-99 (i.e., RRASOR) and calculated a score of three for McKee on that test.
[25] Applying the STATIC-99 test, Rueschenberg calculated a score of two for McKee, giving him a lesser likelihood of reoffense than a score of three. She also considered both static and dynamic factors in concluding McKee had a low risk of reoffense, but those factors did not cause her to adjust McKee's STATIC-99 score.